**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**No. 1:25-CV-00068-MR-WCM**

| | |
|---|---|
| **LINDA CAMPBELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NORTH CAROLINA DEPARTMENT OF** ) | |
| **HEALTH AND HUMAN SERVICES,** ) | |
| **d/b/a BROUGHTON HOSPITAL;** ) | |
| ) | |
| **and** ) | **AMENDED COMPLAINT** |
| ) | |
| **CARL EPLEY (Individually);** ) | |
| ) | **(Jury Trial Demanded)** |
| **and** ) | |
| ) | |
| **MARCUS GUY (Individually);** ) | |
| ) | |
| **and** ) | |
| ) | |
| **JOHN F. WARREN & ASSOCIATES, PA** ) | |
| **d/b/a COMPLEX PSYCHOLOGICAL** ) | |
| **EVALUATIONS (CPE)** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>COMPLAINT</u>

    **NOW COMES** Plaintiff Linda Campbell, by and through her undersigned counsel to

complain of the above-captioned Defendants as follows:

1

## PARTIES

1.      Plaintiff Linda Campbell is an adult at least 18 years old, and a citizen and resident of Morganton, North Carolina (which is located in this District).

2.      Plaintiff is a white female with disabilities.

3.      Plaintiff was an "employee" of Defendant North Carolina Department of Health and Human Services ("Defendant DHHS"), as defined by applicable law, where Plaintiff worked with (and, for a time, was supervised by) Defendant Epley.

4.      Defendant DHHS owned and operated Broughton Hospital, a psychiatric hospital in Morganton, North Carolina.

5.      Defendant DHHS was an "employer", as defined by applicable law, which employed Plaintiff and Defendant Epley.

6.      Broughton Hospital employed, at all times relevant, more than 15 employees.

7.      Defendant Carl Epley is an adult at least 18 years old.

8.      Defendant Epley is a white male.

9.      Defendant Epley is a citizen and resident of North Carolina. Upon information and belief, Defendant Epley resides in this District.

10.     At all times relevant, Defendant Epley was employed by Defendant DHHS at Broughton Hospital, where he supervised Plaintiff.

11.     Defendant Marcus Guy is an adult at least 18 years old.

12.     Defendant Guy is a citizen and resident of North Carolina. Upon information and belief, Defendant Guy resides in this District.

13.     At all times relevant, Defendants Epley and Guy were employed by Defendant DHHS at Broughton Hospital, where Defendant Guy directly supervised Plaintiff for a time.

14.     Defendant John F. Warren & Associates, PA d/b/a Complex Psychological Evaluations (CPE) is a clinical mental health evaluations provider with its principal place of business in Winston-Salem, North Carolina but which conducts business throughout the state ("Defendant CPE").

15.     Broughton Hospital is a client of Defendant CPE, which conducted a clinical mental health evaluation of Plaintiff.

## JURISDICTION, VENUE, JOINDER, AND WAIVER OF SOVEREIGN IMMUNITY

16. This Court has personal jurisdiction over the Defendants.

17. Defendant DHHS is engaged in substantial activity throughout the State, including in this District.  Broughton Hospital's campus is located in this District (Morganton, North Carolina), which is where Plaintiff worked; where Defendants Epley and Guy work(ed); where, upon information and belief, Defendants Epley and Guy reside; where Plaintiff lives; and where most of the facts in this Complaint occurred.

18. Defendant CPE entered into a contract to provide services for Defendant DHHS and / or Broughton Hospital, which includes providing services within the District (regardless of the physical location where those services are provided).  Moreover, Defendant CPE's principal place of business in Winston-Salem, North Carolina is close to this District such that venue in this District does not pose an unreasonable burden.

19.     This Complaint arises under, *inter alia*, 42 U.S.C. § 12131 *et seq*. (Titles II and III of the Americans with Disabilities Act of 1990, as amended), which prohibits discrimination on the basis of disability, and 42 U.S.C. § 2000d *et seq*. (Title VII of the Civil Rights Act of 1964, as amended), which prohibits discrimination on the basis of race / color, and other federal claims.

3

20. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 (relating to federal question jurisdiction) and 28 U.S.C. § 1333(a)(3) (relating to equal rights actions).

21. To the extent that any claims set forth herein are not wholly within the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331-1333, this Court has supplemental jurisdiction over the remaining state court claims pursuant to 28 U.S.C. § 1367.

22. Venue in this Court is proper under, *inter alia*, 28 U.S.C. § 1391.

23. Joinder of claims is permitted under Rule 18 of the Federal Rules of Civil Procedure ("FRCP").

24. Joinder of parties is appropriate under FRCP 19 or 20.

25. By filing a joint petition for removal to this Court, which was granted, all Defendants voluntarily consented to this Court for purposes of personal jurisdiction, subject matter jurisdiction, and venue.

26. Upon information and belief, all pre-requisite conditions for filing this Complaint have been satisfied.

27. Upon information and belief, Plaintiff exhausted her administrative remedies before the United States Equal Employment Opportunity Commission ("EEOC"). Specifically, Plaintiff received her notice of right-to-sue letters ("NRTS") from the EEOC. This Complaint was timely filed within 90 days of the two latest-dated NRTS letters which amended the first NRTS letter due to new (as well as continuing and accruing) violations. Timely NRTS letters are attached as **Exhibit A**. Further explanation is set forth below.

28. Upon information and belief, Plaintiff also exhausted her administrative remedies before the State by having the initial allegations of sex-, disability-, and race / color-based discrimination, harassment, and retaliation in her first EEOC charge adjudicated by the State's

Office of Administrative Hearings ("OAH"). The OAH determination and the DHHS determinations are attached as **Exhibit B**.

29.     Plaintiff submitted a complaint containing new allegations (including wrongful termination and other claims) in her second and third EEOC charges to the State's OAH, giving the OAH an opportunity to adjudicate. The OAH declined to do so, citing lack of jurisdiction.

30.     To the extent that Plaintiff may not have exhausted her administrative remedies before the State, Plaintiff did not do so because she strongly believed, based on her experiences (including the lack of support from Broughton's leadership and OAH's determination of No Cause), that administrative exhaustion would have been futile; the State's OAH does not have authority to award monetary damages to which Plaintiff is entitled for the harms she suffered; Defendant DHHS's actions were patently illegal discrimination, harassment, and retaliation such that Plaintiff should be permitted to pursue her claims in Court without exhaustion; and the OAH investigator had a conflict of interest.

31.     Defendants Epley's and Guy's actions toward Plaintiff Campbell were malicious, corrupt, or fraudulent. Accordingly, Defendants Guy and Epley are not entitled to immunity for their actions that are found to be committed as such.

32.     There was a valid employment contract between Defendant DHHS and Plaintiff Campbell. By entering into this contract, Defendant DHHS waived its sovereign immunity and consented to be sued for breach of its contractual obligations.

33.     Upon information and belief, Defendant DHHS (d/b/a Broughton Hospital) has insurance that covers the claims asserted in this Complaint. By carrying insurance, Defendant DHHS has waived its sovereign immunity up to the extent of coverage.

5

34. Defendants DHHS, Epley, and Guy (collectively, the "State Defendants") waived sovereign immunity by voluntarily removing the Complaint to federal court.

35. To the extent adequate relief is not otherwise available (i.e., claims are barred by sovereign immunity, failure to exhaust administrative remedies, etc.), sovereign immunity does not bar Plaintiff Campbell's claims for violations of the North Carolina Constitution.

36. The facts and claims asserted in this Amended Complaint relate back to the date of the filing.

## FACTS

### Summary of the Case

37. Plaintiff Linda Campbell worked as an Administrative Officer I for Defendant DHHS at Broughton Hospital in Morganton, North Carolina.

38. Plaintiff worked in patient financial services, where Plaintiff supervised two employees (Catherine Largent and Jennifer Lowery).

39. In 2018, while walking, Plaintiff was struck by the car of a Broughton co-worker who was driving under the influence of alcohol and illicit drugs.

40. Plaintiff sustained serious injuries, including traumatic brain injury ("TBI") that impaired her nervous system and altered her personality. In addition to attention-deficit hyperactivity disorder ("ADHD") and post-traumatic stress disorder ("PTSD"), Plaintiff developed difficulties typing (specifically, translating thoughts to correct word order, similar to Dyslexia), intense hyper-sexual behavior, and other neurological issues.

41. Plaintiff went out on Workers' Compensation leave for multiple different periods for treatments and recovery.

42.     Plaintiff's indirect supervisor, Defendant Epley, knew Plaintiff was vulnerable due to effects of her TBI.  Defendant Epley obtained Plaintiff's cell phone number under the false pretense of texting to ask how Plaintiff was doing.

43.     Defendant Epley then promptly began sexting Plaintiff, attempting to solicit nude photos from her, and making sexual advances toward her.

44.     Defendant Epley sent Plaintiff at least one "dick pic" as part of his sexual advances.

45.     Defendant Epley also informed Plaintiff when she was out on Workers' Compensation leave that, when Plaintiff returned to work, Defendant Epley was going to be her new boss so they needed to have sex before it was too late.

46.     Defendant Epley knew that Plaintiff was married.

47.     After Plaintiff had successful therapies that healed many symptoms of her TBI, Plaintiff returned to work in spring 2021.  Back to her normal mental state, Plaintiff promptly informed Defendant Epley that she was not interested in him and instructed him to stop making sexual advances toward her.  Defendant Epley became visibly upset and was intent on making Plaintiff pay for turning him down – A huge blow to his ego.

48.     Plaintiff supervised two employees in her department, Catherine Largent and Jennifer Lowery.

49.     Plaintiff had previously worked with Largent for many years, and they had a cordial relationship without any issues.

50.     Lowery was a new employee.  Lowery was engaged to Largent's cousin and was the daughter-in-law of Bea Tullis (the head of the department who had just retired and was replaced by Defendant Epley).

7

51.     Largent was upset with Plaintiff for returning from Workers' Compensation leave, because leadership had promised Plaintiff's job to Largent if Plaintiff did not return.

52.     Ready to exploit Largent's frustration toward Plaintiff, Defendant Epley involved Largent and Lowery in a relentless campaign of retaliation and harassment against Plaintiff. Their retaliation and harassment are further detailed below.

53.     Through obstinate and disrespectful behavior; harassment and discrimination based on Plaintiff's disability; and numerous false and petty complaints that persisted about two years, Defendant Epley, Largent, and Lowery made every effort to get Plaintiff fired.

54.     Plaintiff made numerous complaints to Broughton's human resources department ("HR"), pleading for support.

55.     Broughton Hospital's leadership, under CEO Vivian Streater, did very little to support Plaintiff.  The actions of leadership were biased, unfair, and ineffective at stopping the continual harassment, discrimination and retaliation.  As a result, Plaintiff was unfairly placed on investigative leave multiple times for false allegations when Plaintiff was seeking help, only to return each time after the investigation found no evidence of wrongdoing by her.

56.     Broughton Hospital's leadership, unable to terminate Plaintiff for legitimate reasons, orchestrated a strategy for terminating Plaintiff based on trumped-up charges. Specifically, Defendant Guy (who, upon information and belief, was made Plaintiff's supervisor to come up with a "reason" to terminate Plaintiff) made false and defamatory statements claiming that Plaintiff had threatened him and was unfit for duty.

57.     Broughton's leadership then relied on an objectively biased and false Fitness for Duty ("FFD") evaluation conducted by Defendant CPE, which had undisclosed ties to Broughton, to wrongfully terminate Plaintiff.

8

58.     On the other hand, leadership refused to take action against Largent, who was targeting Plaintiff, because Largent was black and Broughton's leadership considered doing so an "automatic lawsuit."

59.     When Plaintiff's treatment provider at NC Neuropsychiatry wrote a letter disputing the findings in Plaintiff's FFD evaluation (pointing out the obvious flaws and bias in Defendant CPE's report, as well as the psychiatrist's conflict of interest), Broughton Hospital's leadership disregarded that letter.

60.     Likewise, when Plaintiff's treatment provider recommended that Plaintiff return to work with reasonable accommodations for her disabilities and provided some options. Broughton Hospital did not engage in an interactive process and responded (incorrectly) that any accommodations would be an undue burden.

61.     While the lack of accommodations made work more difficult, Plaintiff's job performance was still satisfactory.

62.     Plaintiff's last VIP review stated that all of Plaintiff's work was submitted on time and there were no issues with her performance.  An email and a recording from Defendant DHHS stated that Plaintiff went above and beyond in performing her work duties.

63.     Broughton Hospital – unduly influenced by Defendant Epley, and signed off on by CEO Streater – was set on terminating Plaintiff no matter what.  Plaintiff never had a fair chance.

64.     After Plaintiff was gone, an employee of Advocacy (a separate entity affiliated with Broughton Hospital) made a false complaint about Plaintiff to the HCPR, falsely alleging that Plaintiff had misappropriated patient funds during a period when Plaintiff was out on leave.

There was information in the false complaint that could only have come from inside Broughton Hospital.

65.    Upon information and belief, the complainant at Advocacy was a woman who was having sex with Defendant Epley that had made the complaint at Defendant Epley's request.

66.    Plaintiff was, pursuant to her new employer's policy, suspended yet again pending the outcome of an investigation that should not have happened.  Like every investigation before it, there was no finding of wrongdoing by Plaintiff.

67.    The harassment and retaliation that Plaintiff experienced at Broughton Hospital went well beyond a hostile work environment – It was severe, pervasive, intentional, unfair, and outside all bounds of moral decency.  Broughton Hospital had many opportunities to do the right thing and stop it, but its leadership refused to do so because Broughton's leadership was unduly influenced by Defendant Epley and fear of a race discrimination lawsuit.  Plaintiff has suffered substantial harm as a result.

68.    The facts below, which will be proven with multiple audio recordings, witness testimony, and other documents, show that Plaintiff suffered greatly, at the hands of Defendants.  Plaintiff trusts this Court to make right the wrongs she suffered.

**Background Facts (Including Sexual Predation by Defendant Epley)**

69.    In or around August 2010, Plaintiff began working for Defendant DHHS as a certified nursing assistant at Broughton Hospital.

70.    Broughton Hospital is a state-owned and -operated psychiatric hospital under Defendant DHHS, located in Morganton, North Carolina.

71.    Plaintiff had a valid employment contract with Defendant DHHS.

72. Plaintiff satisfactorily performed her job duties and demonstrated her value to Broughton Hospital.

73. In December 2016, Plaintiff accepted a position as Administrative Officer I at Broughton Hospital. Plaintiff performed duties related to patient financial matters within the hospital, which included reviewing patient ability to pay; evaluating Medicare, Medicaid, and commercial insurance coverage; overseeing reimbursement; and maximizing receipts.

74. On October 8, 2018, Plaintiff was struck by the car of a Broughton Hospital employee who was driving under the influence of alcohol and illicit drugs on Broughton Hospital's campus and sustained serious injuries, including a TBI that impaired her nervous system and drastically altered her personality.

75. Plaintiff's TBI caused post-concussive headaches and migraines, vertigo, mood instability, impulsivity, panic attacks, anxiety, memory and attention deficits, PTSD, and intense hyper-sexual behavior, among other symptoms. Plaintiff's personality was obviously different than normal.

76. Plaintiff was out of work from October 9, 2018 to October 14, 2018.

77. Plaintiff attempted a return to work on October 15, 2018.

78. Plaintiff, at all times relevant, both before and after the accident, was qualified for her position and satisfactorily performed her job duties.

79. Plaintiff was, at all times relevant, married.

80. Plaintiff's indirect supervisor, Defendant Epley, recognized the ways in which Plaintiff was vulnerable following the accident, including Plaintiff's intense hyper-sexual behavior.

11

81.     Defendant Epley obtained Plaintiff's cell phone number and texted Plaintiff to ask how she was doing.

82.     Defendant Epley soon began texting Plaintiff to compliment her beauty.

83.     Defendant Epley's texts then turned sexual, with Defendant Epley making strong and persistent sexual advances toward Plaintiff, as well as asking very personal sexual questions of Plaintiff.  This led to sexting on multiple occasions.

84.     Defendant Epley attempted to solicit nude photos from Plaintiff on numerous occasions.

85.     Defendant Epley texted at least one nude photo of himself to Plaintiff. Specifically, a "dick pic."

86.     Defendant Epley's persistent sexual advances wore Plaintiff down in her vulnerable mental state to the point she reluctantly gave in to some sexting.  Plaintiff has felt guilty about it since.

87.     After receiving Workers' Compensation coverage for her serious injuries, Plaintiff again took Workers' Compensation leave on October 18, 2018.

88.     Plaintiff returned to light duty work on November 13, 2018, and then to full duty work on December 17, 2018.

89.     Plaintiff was placed back on Workers' Compensation leave on November 12, 2020.

90.     The above periods of Workers' Compensation leave were necessary for Plaintiff to receive treatment for, and recover from, the serious injuries she sustained in the accident on October 8, 2018.

91.     While Plaintiff was on Workers' Compensation leave, Defendant Epley (Plaintiff's indirect supervisor) tried on numerous occasions to convince Plaintiff to meet so they could have sex.

92.     Plaintiff resisted, so she and Defendant Epley never had sex.

93.     During this time, Plaintiff suffered from post-concussive syndrome, cognitive impairment, and hyper-sexual behavior, making her unable to fully comprehend her actions with Defendant Epley or refuse his sexual advances.

94.     If Plaintiff had not been suffering from the TBI, Plaintiff would not have been interested in Defendant Epley or sexted with him (and Plaintiff had not done so or had any interest in Defendant Epley before the accident).

95.     In spring 2021, Plaintiff received certain therapies (hyperbaric oxygen chamber and neuro-feedback) at Apex Brain Center.  The therapies were successful in alleviating most of her symptoms.

96.     After Plaintiff was treated by Apex Brain Center, Defendant Epley texted Plaintiff to ask whether she was "still crazy."  Plaintiff responded no.

97.     Around the same time, Defendant Epley informed Plaintiff that their boss (Bea Tullis) was retiring and Defendant Epley would be taking over the position (with Defendant Epley being Plaintiff's official boss).

98.     Defendant Epley put more pressure on Plaintiff to have sex with him.  Defendant Epley specifically stated that they needed to have sex before Defendant Epley became Plaintiff's boss because, then, "it would be too late."

99.     Upon information and belief, Defendant Epley has had sexual relations with multiple female employees throughout Broughton Hospital.

13

100.     Upon information and belief, Defendant Epley has been caught having sex at work by maintenance workers.

101.     Upon information and belief, Defendant Epley had sex with at least one female employee at Advocacy, a separate entity located on Broughton Hospital's campus.

102.     Plaintiff, back to her normal mental state, informed Defendant Epley that she was not interested in him and that Defendant Epley needed to stop making sexual advances toward her.

103.     Plaintiff was optimistic about returning to work.

104.     Plaintiff loved her job, had recovered from her TBI and most of its symptoms after a long struggle, and thought she had ended things with Defendant Epley.  In short, Plaintiff was looking forward to putting the past behind her and things returning to normal like before the car accident.

105.     Plaintiff returned to light duty work on May 24, 2021, and then to full duty work on June 4, 2021, with Defendant Epley as her new boss.

106.     One day, during a conversation with Defendant Epley, Plaintiff mentioned that she had not really wanted to have sex with Defendant Epley and that she had recovered to her normal self.

107.     Defendant Epley became visibly upset when Plaintiff reiterated her lack of interest in him.

108.     Upon information and belief, Defendant Epley is narcissistic.  Plaintiff communicating her lack of interest in him was an intolerable blow to his ego.

109.    After Defendant Epley became Plaintiff's boss and Plaintiff informed Defendant Epley that she was not interested in him, Defendant Epley began a relentless campaign of retaliation against Plaintiff at Broughton.

110.    Plaintiff was, at all times relevant, a good employee who satisfactorily performed her job duties and was loyal to Broughton Hospital.

111.    Plaintiff supervised two employees named Jennifer Lowery and Catherine Largent.

112.    Prior to Plaintiff expressing her lack of interest to Defendant Epley, Plaintiff and Largent had worked together since 2014 and had a cordial relationship.

113.    Lowery was a new employee to the department who had been friends with Largent outside of Broughton Hospital.  Lowery was engaged to Largent's cousin.  Lowery was also Tullis' daughter-in-law.

114.    There are multiple employees at Broughton, including Lowery, who were hired based on nepotism.

115.    Defendant Epley, who had also worked with Largent for several years, turned Largent and Lowery against Plaintiff.

116.    Upon information and belief, Defendant Epley promised Largent a promotion in return for assisting him with retaliating against Largent.

117.    Examples of retaliation include, but are not limited to, the following:

a.      In June 2021, Plaintiff's keys were stolen and she was required to pay $125.00 for a new set of keys.  About a week later, the key was found in Lowery's training books.  Lowery was off the day the keys went missing.  Upon

15

information and belief, Defendant Epley or Largent had stolen Plaintiff's keys and hid them there.

b.      In August or September 2021, Largent complained that Plaintiff had asked to look in Largent's pocketbook and that Plaintiff was treating Largent differently because Largent was black, which was false.  Defendant Epley investigated Largent's complaint and, despite no supporting evidence, issued Plaintiff a write-up on September 16, 2021.  The write-up also falsely stated that Plaintiff had yelled at Largent when, in fact, Largent had yelled at Plaintiff.  The investigation was unfair and biased – Defendant Epley had created an opportunity to target Plaintiff.  Defendant Epley mischaracterized the incident, improperly citing Plaintiff for violating policy, disrupting the workplace, and interacting with others in an inappropriate, discourteous, and unprofessional manner.  As explained in more detail below, this write-up was later retracted once leadership learned about Defendant Epley's undisclosed conflict of interest and misconduct toward Plaintiff.

i.The investigation was completely biased and unfair because it was done by Olga Propst, a black employee and friend of Largent, and Defendant Epley.

ii.Plaintiff did not "appeal" the write-up (i.e., there was no appeal option, but Plaintiff could have filed a grievance against the write-up / investigators) because it was given to her the work-day before she went out on approved FMLA leave for 30 days for her husband's serious medical condition (aortic valve surgery).  While Plaintiff was out, Plaintiff missed the

16

grievance deadline. Defendants knew the grievance deadline was during Plaintiff's FMLA leave, yet did not extend the deadline. When Plaintiff spoke with Defendant Epley about a grievance upon her return, Defendant Epley told Plaintiff it was too late to appeal.

c.      After Defendant Epley became Plaintiff's boss, Largent and Lowery suddenly grew obstinate and insisted they did not need to listen to Plaintiff. They also pretended they did not know how to do things they knew how to do for the purpose of harassing Plaintiff.

d.      Largent and Lowery were purposely insubordinate toward Plaintiff, which Defendant Epley and other leaders exacerbated when they failed to effectively respond to Plaintiff's multiple complaints.

e.      Largent complained to Defendant Epley that she thought Lowery had been talking to Plaintiff about Largent in Plaintiff's office behind Largent's back. As a result, Largent demanded that Defendant Epley instruct Plaintiff to keep her office door open. Yet, when a former employee had accused Largent of talking about the former employee in the same manner, Largent stated that it was a "petty" reaction. Despite Plaintiff's need to meet privately with employees on certain matters, Defendant Epley instructed Plaintiff to leave the door open.

f.      Defendant Epley often met privately with Largent and Lowery. Upon information and belief, to make Plaintiff feel isolated and to discuss ways to harass and, ultimately, get rid of Plaintiff.

g.      In July 2021, Largent again complained about Plaintiff for having window tint in her office because Largent could not see whether Plaintiff was in there (i.e.,

17

the tint was added to help prevent Plaintiff's migraines when she was still suffering from the TBI). Defendant Epley again sided with Largent, making Plaintiff remove the window tint. Yet Largent also had window tint and was allowed to leave it up.

h. On multiple occasions when Plaintiff closed her office blinds, Defendant Epley stood in the hallway so as to get Largent's attention and then opened them without speaking to Plaintiff. Defendant Epley did not do this to other employees, only Plaintiff. Defendant Epley knew it upset Plaintiff. Moreover, the primary reason Plaintiff was closing her blinds in the first place was to prevent Defendant Epley from constantly staring in them, which was creepy and intimidating to Plaintiff.

i. Defendant Epley assigned Plaintiff less favorable, and unfair, work assignments (often to the benefit of Largent).

j. Largent obstinately refused to sign Plaintiff's VIP review of Largent, despite not expressing any issues with the review. Largent stated that Defendant Epley said Largent did not have to sign it, which, upon information and belief, is true.

k. Defendant Epley routinely undermined Plaintiff in front of others, including Largent and Lowery. For instance, Defendant Epley was very rude to Plaintiff in a departmental meeting with Reba Yancey for no legitimate reason. Yancey commented about it to Plaintiff after the meeting.

l. In February 2022, Largent refused to assist Lowery with a Medicaid application as Plaintiff had instructed.

18

m.    In February 2022, Largent stopped signing a check-list on patient paperwork as Plaintiff had instructed, and Largent told Lowery to do the same.

n.    Largent repeatedly questioned and criticized Plaintiff's instructions with Defendant Epley and Lowery, without discussing with Plaintiff.

o.    Largent complained she couldn't see Plaintiff because it was too dark with just the lamp on and she needed to turn on more lights.  Largent was aware of Plaintiff's disability which caused sensitivity to lights and associated migraines. Largent previously kept her office the same way but complained solely to harass Plaintiff.

p.    Lowery falsely alleged that Plaintiff was going to "shoot up the place."

q.    Lowery falsely alleged the Plaintiff would not let Lowery leave Plaintiff's office.

r.    On February 24, 2022, Defendant Epley informed Plaintiff that Plaintiff's position on the budget list had dropped as a result of Defendant Epley's aforementioned retaliatory write-up of Plaintiff, so Plaintiff's pay-rate may be negatively impacted.  Defendant Epley stated that what Plaintiff had done was really bad.  Before Defendant Epley's retaliatory write-up, Plaintiff was ranked at the top for pay increase and should otherwise have received one.

s.    The above actions by Defendant Epley, Largent, and Lowery would typically have resulted in discipline at Broughton Hospital, but they were afforded more favorable treatment by Broughton's leadership.  However, Plaintiff was targeted for discipline on multiple occasions based on false allegations.  The false allegations often resulted in Plaintiff being suspended.  When Plaintiff made

19

complaints, they largely went unaddressed and responses were ineffective at stopping wrongful conduct directed at Plaintiff.

t.        Largent and Lowery would disappear for hours without notifying Plaintiff.

118.    Lowery informed Plaintiff that Bea Tullis (and, upon information and belief, Defendant Epley) had promised Plaintiff's job to Largent while Plaintiff was out on Workers' Compensation leave, so Largent was angry that it did not happen.

119.    Largent received an $8,000 pay-raise for which Plaintiff was not considered, which was unfair because they were supposed to be reviewed for a pay-raise at the same as part of the same department.

120.    Lowery also informed Plaintiff that Defendant Epley and Largent were actively working together to get Plaintiff fired.

121.    Lowery stated that Defendant Epley and Largent were closely scrutinizing Plaintiff and writing down everything to use to get Plaintiff fired.

122.    Lowery then apologized for her own actions and told Plaintiff that Defendant Epley and Largent had pressured her to complain about Plaintiff.

123.    Plaintiff asked Defendant Epley on numerous occasions to stop harassing her, because Plaintiff could not handle much more.

124.    Defendant Epley had seen Plaintiff upset and crying from the retaliation, yet Defendant Epley continued unabated.

125.    Upon information and belief, Defendant Epley did not think Plaintiff would complain about him because Plaintiff would not want information about her and Defendant Epley sexting to come out, especially since Plaintiff was married.

20

## Plaintiff's Complaint Against Defendant Epley

126.    Plaintiff eventually became so emotionally distraught from the relentless harassment and retaliation orchestrated by Defendant Epley that Plaintiff made an internal complaint against Defendant Epley.

127.    On March 13, 2022, Plaintiff emailed Candice Justice (Assistant Human Resources Manager) and Alicia Nexsen (Employee Relations Specialist) requesting to meet privately to discuss issues in her department.

128.    A meeting was scheduled for the next day, with Defendant Epley invited.

129.    The next day, on March 14, 2022, Plaintiff deleted the meeting invite.  Plaintiff emailed Justice and Nexsen that Plaintiff did not want Defendant Epley to see the meeting invite.

130.    During the meeting, Plaintiff provided Justice and Nexsen with a written report of concerns about Defendant Epley and Largent.

131.    On March 16, 2022, Justice and Nexsen forwarded Plaintiff's complaint to CEO Streater, who called for an investigation.  The investigation team included the spouse of an HR employee and the Quality Risk Director who worked closely with CEO Streater and Defendant Epley.

132.    Defendant Epley and CEO Streater have a very close relationship, and Defendant Epley has substantial influence over CEO Streater's decision-making.

133.    Upon information and belief, Defendant Epley and CEO Streater exerted undue influence on the internal investigation against Plaintiff and chose investigators who would be biased in favor of Defendant Epley.

134.    On March 22, 2022, Plaintiff requested that Defendant Epley be reassigned to a different area of the hospital while the investigation was pending.

21

135.    On March 29, 2022, Plaintiff was reassigned and began reporting to Reba Yancey (Business Officer II) at a the same location in the same administrative building.

136.    CEO Streater stated that Plaintiff's reassignment to Yancey was permanent.

137.    During the investigation, Plaintiff continued to be a good employee who satisfactorily performed her job duties without disciplinary or attendance issues.

138.    Plaintiff and Yancey had a great working relationship.

139.    Yancey informed CEO Streater that Plaintiff was a great employee who did everything Yancey requested.

140.    On April 13, 2022, the investigators informed CEO Streater that they did not substantiate Plaintiff's allegations but had identified certain areas for improvement regarding interpersonal interactions and communication between employees in the department.

141.    There was sufficient information to substantiate Plaintiff's allegations, but, upon information and belief, the investigators (who were internal employees acting in the hospital's interests) were unduly influenced to not make findings that resulted in discipline for Defendant Epley.

142.    Defendant Epley admitted during the investigation that Defendant Epley had sexted Plaintiff and sent the dick pic.

143.    Investigators also found that Defendant Epley failed to disclose to HR his prior relationship with Plaintiff.

144.    Despite the above findings, upon information and belief, Defendant Epley was not appropriately disciplined – He was only assigned training classes.

145.    Training classes were an insufficient and ineffective response by the hospital.  As a result, leadership enabled and empowered Defendant Epley's behavior, which continued.

22

146. On April 29, 2022, CEO Streater and one of the investigators met with Plaintiff to communicate the outcome of the investigation. CEO Streater expressed an intention to address identified concerns and improve working relationships.

147. Plaintiff was told she was "permanently" reassigned to Yancey, effective April 29, 2022.

148. Defendant Epley's improper write-up of Plaintiff on September 16, 2021 was also inactivated.

149. Plaintiff asserts that the investigators had sufficient information from the investigation to support her complaint; however, the investigators were biased toward protecting Broughton Hospital and Defendant Epley from discipline and facts reflecting poorly on them.

150. The investigators intentionally sought to find a "middle-ground" that responded to Plaintiff's concerns without finding the respondent (Defendant Epley) had done anything wrong.

151. Such a "middle ground" outcome that protects Broughton and its leadership is common at Broughton, resulting in serious concerns not being effectively addressed.

152. Yancey stated her belief that, once Defendant Epley was removed from the department, Largent would no longer have any issues with Plaintiff.

153. Plaintiff informed Yancey that Plaintiff was relieved to finally be free from Defendant Epley's control, harassment, and retaliation.

154. Defendant Epley was promoted to Broughton's chief financial officer ("CFO").

155. In responses to Plaintiff's complaints, Defendant DHHS cited different dates for Defendant Epley's promotion. Specifically, Defendant Epley informed Plaintiff that his promotion occurred on July 1, 2021. The OAH investigator found that it occurred in May.

23

## **Continued Harassment and Retaliation**

156.    Defendant Epley informed Yancey separately that "nothing had changed for now" because Defendant Epley, as CFO, will still review and sign off on all of Plaintiff's work.

157.    Unfortunately, Defendant Epley was right. Broughton Hospital's actions did not stop Defendant Epley's continued control, harassment, and retaliation of Plaintiff.

158.    In May and June 2022, Defendant Epley began looking for reasons and ways to enter Plaintiff's new work location.

159.    On June 1, 2022, Yancey received complaints about Defendant Epley from both Plaintiff and one of Yancey's employees named Kathy Franklin.

160.    In one day, Defendant Epley walked past Plaintiff's new office at least 20 times while staring in at Plaintiff.

161.    Defendant Epley went by Franklin's cubicle multiple times and asked her "off the wall" questions that had nothing to do with their jobs, while staring over at Plaintiff as he was talking with Franklin.

162.    When Plaintiff went over to talk with another employee, Kim Moody, Plaintiff caught Defendant Epley staring at Plaintiff there, too.

163.    Plaintiff, very upset, went to Yancey to ask when Defendant Epley would be moved because Plaintiff was tired of still being harassed and intimidated on a constant basis.

164.    CEO Streater appeared to neglect Plaintiff's concerns about Defendant Epley, despite being substantiated by objective witnesses like Yancey and Yancey's employees.

165.    On one occasion, CEO Streater downplayed the concerns by stating that Defendant Epley was only "conducting normal business activities and utilizing the copier."

24

166.    Many times, Defendant Epley was not even holding a piece of paper (to copy or that had been printed).

167.    As a result of CEO Streater's ineffective response, Plaintiff was more intimidated and continued to experience harassment by Defendant Epley.

168.    In late June 2022, it became clear to Plaintiff that Broughton's leadership was not promptly or effectively addressing her complaints.

169.    In early July 2022 (about three months after Plaintiff's initial complaint on March 13, 2022 had not been addressed), Defendant Epley was finally moved into a new office away from Plaintiff.

170.    CEO Streater's unnecessary delay in relocating Defendant Epley and refusal to listen to Plaintiff's serious concerns contributed to Plaintiff's emotional distress during that time.

171.    On August 18, 2022, Lowery complained about Plaintiff, stating that there was minimal communication within the department and said communication was "draining."

172.    Lowery could not perform the essential duties of her position, but Lowery was afforded deference and protection when Plaintiff raised concerns with Lowery's performance.

173.    On September 7, 2022, Plaintiff emailed Nexsen and requested to meet about department issues.  During the meeting, Plaintiff discussed ongoing concerns in her department. Specifically, that the harassment by Lowery and Largent had not stopped.  There were also concerns with Largent's and Lowery's poor performance, which were part of the harassment.

174.    On September 9, 2022, Nexsen and Justice forwarded Plaintiff's concerns to CEO Streater.

175.    Upon information and belief, there was no investigation or effective response to Plaintiff's concerns.

25

176. On September 9, 2022, Plaintiff sent an email to HR and went to HR in person about a false allegation Largent made against Plaintiff involving notes. Largent and Lowery went to a social worker to try to persuade the social worker to lie to back up Largent's story.

177. Largent was not disciplined for her false allegation or cover-up.

178. Largent would leave her office for long periods of time, and she took vacation, without notifying Plaintiff. Notification was required by policy for safety reasons. However, Largent was not disciplined for doing so.

179. Largent was granted a special privilege agreement that allowed her to notify Defendant Epley of her schedule instead of Plaintiff, her supervisor. There was not a legitimate reason for such a special privilege.

180. On October 19, 2022, Plaintiff emailed Nexsen and Justice to request another meeting concerning the ongoing issues with Largent.

181. On October 28, 2022, Plaintiff emailed Nexsen and Justice to inform them that Plaintiff and Yancey were holding weekly meetings and training to help resolve the situation with Largent.

182. The same day, on October 28, 2022, Largent complained to Nexsen and Justice about Plaintiff. Specifically, Largent thought Plaintiff was going to try to terminate Largent for poor work performance and insubordination.

183. On November 1, 2022, because Broughton Hospital's leadership had failed to promptly, equitably, and effectively address the situation, CEO Streater, Nexsen, and Justice met with the state's assistant attorney general, Hilary Ventura, to discuss Largent and develop an action plan.

26

184.    On December 16, 2022, Lowery complained that, early the same day, Plaintiff had exposed her breasts and hip area to Lowery in the workplace. This was a lie and never happened.

185.    Lowery also stated that Plaintiff had threatened to bring a gun to work and kill everyone, which was also a lie and never happened.

186.    Upon information and belief, Lowery made these false complaints in an effort to distract from concerns with her own poor performance, to harass Plaintiff and, ultimately, to get Plaintiff terminated.

187.    Plaintiff was very confused because Lowery had first participated in the harassment against Plaintiff, then apologized and blamed Defendant Epley and Largent (i.e., Lowery later sent Plaintiff a text that stated, "I love you sweet lady!!"), and then went back to harassing Plaintiff by making false allegations to leadership in an apparent attempt to get Plaintiff terminated.

188.    Upon information and belief, Defendant Epley and Largent were pressuring Lowery to attack Plaintiff.

189.    On December 16, 2022, Plaintiff was placed on investigative leave with pay so Lowery's complaint could be investigated.

190.    CEO Streater brought in Heather Brewer (Assistant Director for Hospitals) and Karen Burkes (Division Director) to assess the situation.

191.    On December 20, 2022, Burkes assigned Brewer and Kimberly Kennedy (School Administrator) to investigate Lowery's complaint.

192.    On January 4, 2023, the investigators concluded there was insufficient evidence to support any of the allegations in Lowery's complaints.

193.    On January 14, 2023, Plaintiff was reinstated.  Plaintiff returned to work on January 17, 2023.

194.    Despite no finding of wrongdoing against Plaintiff and the issues being caused by Largent and Lowery (not Plaintiff), CEO Streater stripped Plaintiff of supervisory duties, reduced her responsibilities, and changed her job title without minimal due process or a finding of wrongdoing.

195.    CEO Streater claimed that no due process was required because Plaintiff's job classification and pay remained the same.

196.    Upon information and belief, CEO Streater's actions were part of Streater's strategy to ultimately terminate Plaintiff.

197.    Yancey informed CEO Streater that, if Yancey was not removed from the situation involving Largent and Lowery's harassment of Plaintiff, Yancey was going to quit.

198.    Despite CEO Streater stating that Plaintiff's reassignment to Yancey was permanent, CEO Streater moved Plaintiff's department under Defendant Marcus Guy.

199.    Defendant Guy was supposedly tasked with restoring harmony to the department.

200.    Defendant Guy informed Plaintiff in a private meeting that "HR adds no value."

201.    Defendant Guy stated the situation with Lowery and Largent was a "shit storm."

202.    Yancey had informed leadership, including CEO Streater, that Plaintiff had been a great employee and the problems were caused by Largent and Lowery.

203.    Rather than address the real cause of the problems, CEO Streater kept Plaintiff, Largent, and Lowery together and never took appropriate disciplinary action against Largent or Lowery.

204.     Due to CEO Streater's failure to take appropriate action to address the harassment and retaliation, which CEO Streater knew about, Plaintiff continued to suffer harm.

205.     Defendant Guy had very close relationships with CEO Streater and Defendant Epley.

206.     Upon information and belief, Defendants Guy and Epley had significant influence over CEO Streater's decision-making.

207.     Upon information and belief, Defendant Guy's real task was to appear to be objective while contriving a reason to terminate Plaintiff, under the influence and/or direction of CEO Streater and Defendant Epley.

208.     Defendant Guy had been used in this way to effectuate termination of at least one other employee before at Broughton.

209.     Defendant Guy told Plaintiff in a private meeting that he would "bring troubles down upon [employees'] head[s]" until they quit.

210.     Defendant Guy's statement in the above paragraph intimidated Plaintiff.

211.     Plaintiff and Defendant Guy previously had a good relationship, and Defendant Guy had complimented Plaintiff's work performance.

212.     That good relationship changed once it became apparent that Defendant Guy was trying to find a way to wrongfully terminate Plaintiff.

213.     Defendant Guy intentionally tried to discourage Plaintiff.  As an example, Defendant Guy knew that, as a result of the workplace accident that resulted in Plaintiff's TBI, Plaintiff was still slower at typing and word processing.  Plaintiff sometimes typed words backwards and then had to correct them.

29

214. Defendant Guy publicly criticized Plaintiff's writing in a meeting, which included Largent and Lowery, while smirking at Plaintiff.

215. Defendant Guy assigned Plaintiff multiple lengthy writing assignments, including drafting a policy manual, and then complained about how long Plaintiff took to complete them.

216. Defendant Guy did not offer Plaintiff any accommodations or assistance for the effects of Plaintiff's disabilities.

217. Plaintiff requested that those types of assignments be given to others for Plaintiff to supervise, consistent with their job duties, but Defendant Guy responded that only Plaintiff could do them.

218. Despite Defendant Guy's harassment of Plaintiff, Plaintiff satisfactorily performed these duties (despite the increased difficulty) and did not quit.

219. Defendant Guy told Plaintiff that her being a team-player and caring worked against her.

220. Upon information and belief, Defendant Guy was trying to dissuade Plaintiff from being a caring team-player to create another reason to terminate her.

221. Defendant Guy, in multiple private meetings with Plaintiff, engaged in gaslighting and intimidation of Plaintiff.

222. In one meeting, Defendant Guy stated to Plaintiff: "You don't want to know the depths of me. I am a monster. But, I keep it in the cage."

223. Defendant Guy led Plaintiff to believe that he took over the department to get sufficiently documentation to move Largent and Lowery when, in fact, he was there to effectuate termination of Plaintiff.

224. Plaintiff was confused and intimidated by Defendant Guy's statements, which came across as threatening and intimidating.

225. Defendant Guy held weekly meetings with Plaintiff, Largent, and Lowery.

226. In one meeting, Largent and Lowery both "blew up" with angry outbursts. Largent yelled at Plaintiff and stated that Plaintiff cannot use her disability to make people feel sorry for her. Lowery then yelled that Plaintiff was a liar.

227. Despite Largent and Lowery's angry outbursts, Defendant Guy stated that Plaintiff remained calm and composed.

228. Defendant Guy ended the meeting and reported what happened to CEO Streater. Defendant Guy stated that Largent and Lowery "attack[ed]" Plaintiff.

229. When Defendant Guy was unsuccessful in finding a legitimate reason to terminate Plaintiff or making Plaintiff resign, Defendant Guy reported to CEO Streater that, during a meeting between Defendant Guy and Plaintiff in late February 2023, Plaintiff stated, "[Streater] betrayed me and if you betray me, I'll cut you like I cut myself."

230. CEO Streater called for another investigation of Plaintiff.

231. Defendant Guy had taken the term "cut" from a text that Plaintiff had sent to Defendant Epley, in which Plaintiff stated that Defendant Epley first wanted to have sex with her and then wanted to "cut" (meaning, harm) her.

232. Upon information and belief, Defendant Epley either informed Defendant Guy about this text, or Defendant Epley informed a third-party who informed Defendant Guy.

233. Upon information and belief, Defendant Guy used this term to make it look more likely that Plaintiff had made the threatening statement that he falsely accused her of making.

234. Defendant Guy's report was a blatant lie, as Plaintiff never said anything of the sort or threatened Defendant Guy or anyone else in any way. Plaintiff has also never cut herself or anyone else, ever.

235. On April 18, 2023, Plaintiff met with Nexsen and Justice to discuss Defendant Guy's false allegations concerning the February 20, 2023 meeting.

236. Plaintiff explained that, at the meeting, Plaintiff told Defendant Guy that she was at an "impasse" with Largent and Lowery, that she had suffered ongoing harassment for two years, and she just wanted the harassment and unfair targeting to stop.

237. Defendant Guy informed Plaintiff that "nobody is going to fix these people" and "nobody is going to fix [Epley]."

238. Defendant Guy's response made Plaintiff feel defeated, demoralized, and hopeless – Plaintiff was suffering for their wrongdoing.

239. Plaintiff was very frustrated, as Plaintiff had been trying to be a good, respectful supervisor and did not understand why Broughton's leadership was not supporting Plaintiff when others were targeting her for no legitimate reason.

240. Nexsen and Justice responded that they would review Plaintiff's concerns and provide a written response.

241. Plaintiff did not receive a response from Nexsen and Justice until after Plaintiff was terminated.

242. Plaintiff was notified that no disciplinary action would occur in response to her concerns.

243. Upon information and belief, Plaintiff's concerns were not properly investigated.

244. Defendant Guy specifically stated that Broughton Hospital could not take adverse action against Largent because she was black.

245. A trustworthy witness, who will remain unnamed in this Complaint due to fear of retaliation, heard Defendant Guy state that leadership gave such preferential treatment to black employees.

246. Defendant Guy informed Plaintiff in a private meeting that "blacks" have a sense of "entitlement", which he had seen a lot.

247. Defendant Guy compared Largent to a "Pitbull" and stated that Plaintiff should not be surprised that Largent "bites."

248. A trustworthy witness also informed Plaintiff that the witness had seen emails between leaders that discussed how to terminate Plaintiff. The witness stated that a friend in HR remarked that the friend knew about leadership's unjustified intentions to terminate Plaintiff and thought it was wrong.

249. On one occasion, Plaintiff was explaining to Defendant Guy the extent of the harassment and retaliation she was enduring.

250. Defendant Guy stated that he would "back up" Plaintiff's claims of mistreatment by Largent and Lowery.

251. Upon information and belief, Defendant Guy did not back up Plaintiff.

252. In a private meeting with Plaintiff, Defendant Guy attempted to talk Plaintiff out of filing a complaint, stating that nobody would believe her and that the retaliation would only get worse.

253. Defendant Guy stated that he and CEO Streater knew how bad the harassment of Plaintiff by Largent and Lowery was.

254. Defendant Guy stated that CEO Streater had tried to move Largent and Lowery, but was apparently unable to do so because they refused to move.

255. Upon information and belief, CEO Streater did not make such an effort (at least not in good faith).

256. As CEO, Streater had the authority to move employees, which was demonstrated by her moving Plaintiff's department under Reba Yancey.

257. Defendant Guy told Plaintiff that, in the "real world" (not the State government), Largent and Lowery would have been terminated for their mistreatment of Plaintiff.

258. CEO Streater, instead of taking effective action to stop the harassment and retaliation of Plaintiff, allowed Plaintiff to be further targeted.

## Wrongful Termination Based on False Complaint, and Biased and Fabricated "Fitness for Duty" Evaluation

259. On April 18, 2023, Defendant Guy met with CEO Streater, Defendant Epley, Justice, and Nexsen.

260. Defendant Guy stated that Plaintiff was erratic, unstable, and potentially dangerous based on Plaintiff's alleged false comment about cutting Defendant Guy and other false allegations.

261. Defendant Guy's statements and supposed "concerns" were objectively false and made in an effort to get Plaintiff terminated.

262. Based on Defendant Guy's statements, CEO Streater directed an FFD evaluation to determine whether Plaintiff was fit to perform essential job functions, and to determine if Plaintiff posed a risk to herself or others in the workplace.

34

263.    Upon information and belief, neither Defendant Epley, Defendant Guy, Largent, nor Lowery was required to undergo an FFD evaluation.

264.    Plaintiff was placed on investigative leave with pay on April 26, 2023, pending the outcome of the FFD evaluation.

265.    Broughton Hospital referred Plaintiff to Defendant John F. Warren & Associates, PA, d/b/a Complex Psychological Evaluations ("Defendant CPE") for the FFD evaluation, which was conducted by Christopher A. Baker, Psy.D. in Winston-Salem, North Carolina on May 15, 2023.

266.    Dr. Baker's FFD evaluation report was issued the same day, on May 15, 2023.

267.    Defendant CPE's report was signed by both Dr. Baker and Dr. Warren, despite Dr. Warren not participating in the FFD evaluation.

268.    Dr. Warren never met Plaintiff.

269.    There were material biases, conflicts of interest, and other serious causes for concern with this FFD evaluation.

270.    According to his curriculum vitae, Dr. Warren had visiting staff privileges at Broughton Hospital since 2006.  Dr. Warren also founded Defendant CPE.

271.    Upon information and belief, Defendant CPE and Dr. Warren are closely connected with Broughton leadership, including CEO Streater, Defendant Epley, and Defendant Guy.

272.    There was objectively insufficient evidence in Defendant CPE's report to determine that Plaintiff was unfit to perform essential job functions, or to determine that Plaintiff posed a risk to herself or others in the workplace.  Accordingly, these were not the initial report's findings.

273.     Rather, Dr. Baker generally concluded in Defendant CPE's report that Plaintiff "evidenced likely psychiatric and cognitive difficulties of unknown origins that seem likely to have contributed to the instant reason for referral …" and, based on that general conclusion, that Plaintiff was unfit for duty at that time.

274.     There were two different copies of the report, one report given to Plaintiff and a different report provided to Broughton Hospital.

275.     Defendant CPE and Defendant DHHS intentionally withheld Defendant CPE's report, which included important information, from Plaintiff.

276.     Plaintiff was accidentally made privy to the hospital's copy of the Defendant CPE's report, which contained additional medical history of Plaintiff, other information about Plaintiff, and recommendations that Plaintiff was not supposed to see.

277.     Defendant DHHS relied on the information that it intended to withhold from Plaintiff in its decision concerning whether to separate Plaintiff from employment.

278.     Upon information and belief, Dr. Baker and Broughton Hospital violated Plaintiff's health privacy rights by disclosing Plaintiff's health information without Plaintiff's consent.

279.     When Plaintiff asked Broughton for a copy of the full report from the hospital to review so Plaintiff could respond to its contents, the hospital refused and stated that the report was its paid-for copy.

280.     Broughton Hospital did not initially know that Plaintiff had seen its copy.  When Plaintiff informed them, they were upset about it.  This occurred on a conference call that included Plaintiff, Defendant Guy, Justice, and possibly others.

36

281. Before Plaintiff informed Broughton that she had seen the hospital's copy of the report, when Plaintiff asked, Justice lied by responding that Dr. Baker had neither reviewed Plaintiff's private medical information nor made any recommendations.

282. Broughton Hospital changed Plaintiff's employment status to Extended Illness Leave, effective May 26, 2023, despite Plaintiff not having any illness.

283. During the meeting, Broughton offered Plaintiff to take FMLA leave.

284. Plaintiff refused to take FMLA leave because Broughton wanted her to admit to having serious mental illness, which was false, and Plaintiff believed Defendants would use such an admission to later terminate Plaintiff.

285. Plaintiff was shocked and confused by Defendant CPE's findings in its FFD evaluation report.

286. Plaintiff shared a copy of her FFD evaluation report with her long-time specialist, Amy Boison, PMHNP-BC, at NC Psychiatry for review.

287. On June 1, 2023, Boison performed an independent FFD evaluation of Plaintiff and found that Plaintiff was stable, fit for duty, and able to return to work immediately.

288. Boison further stated that Dr. Baker's characterization of Plaintiff was in stark contrast to Boison's experience with Plaintiff that was formed over consistent appointments that had been held with Plaintiff every 1-3 months since March 3, 2020.

289. In addition to the above-stated concerns, Boison spoke with Dr. Baker on June 1, 2023. On that phone call, Dr. Baker stated that he could not discuss Plaintiff with Boison beyond what was in the report.

290.    Dr. Baker stated to Boison that Broughton Hospital had provided Defendant CPE with employment-related information about Plaintiff <u>before</u> the FFD evaluation (which Dr. Baker stated could have included disciplinary reports, etc.).

291.    Upon information and belief, Broughton Hospital provided Defendant CPE and Dr. Baker with all of the ridiculous false statements that employees claimed Plaintiff had made.

292.    Thus, Dr. Baker lied in his report by stating that "clinical interview and mental status examination … and well researched test of behavioral health experiences and symptoms … are the **<u>sole</u>** sources of information relied upon in the current evaluation" (emphasis added).

293.    In a letter for Plaintiff to provide to Broughton Hospital, Boison stated: "It is nonsensical to me that this evaluation, describing mild PTSD and mild ADHD symptoms, would lead to an 'unfit for duty' determination.  Nowhere in this report is there any indication that Mr. Baker believed [Plaintiff] to be a danger to herself or others."

294.    Dr. Baker's FFD evaluation report did not find any evidence that could have led to Broughton Hospital concluding that Plaintiff was unfit for duty or a danger to anyone.

295.    Upon information and belief, once Plaintiff and Boison criticized Dr. Baker's report, Defendant CPE issued a revised report with new findings that better supported Broughton's goal of terminating Plaintiff.

296.    Upon information and belief, Dr. Baker's clinical opinion was unduly and improperly influenced by Broughton Hospital's administrators (based on their relationship with Defendant CPE through Dr. Warren), which resulted in a false and unreliable report that was used to unfairly and unjustifiably terminate Plaintiff.

297.    Upon information and belief, Broughton's leadership has used Defendant CPE to effectuate its desired employment outcomes before.

298.    Boison wrote a letter, dated June 7, 2023, stating her above-stated professional determinations and concerns with the FFD evaluation.

299.    Boison recommended that Broughton Hospital provide Plaintiff with reasonable accommodations for her disabilities.

300.    Broughton Hospital did not engage in any interactive process to provide Plaintiff with reasonable accommodations.

301.    Broughton Hospital, appearing to completely disregard information provided by Plaintiff and Boison, moved to separate Plaintiff from employment based on Defendant CPE's biased and flawed report.

302.    On June 9, 2023, Plaintiff attended a separation conference with Defendant Guy, Nexsen, and Justice.

303.    Plaintiff was not permitted to review the hospital's different copy of the FFD evaluation report, present witnesses (who could have refuted the flawed findings), or bring an attorney (who could have identified the hospital's wrongful conduct and failure to provide minimal due process) to the separation meeting.

304.    Despite Plaintiff pleading her case that she was available and fit for duty, which were true and substantiated by her neuro specialist, Plaintiff received a letter from Defendant Guy, dated June 27, 2023, stating that Plaintiff was separated from employment at Defendant DHHS.

305.    In Defendant Guy's June 27, 2023 letter, the hospital appeared to decline Plaintiff's request for reasonable accommodations for her disabilities, citing undue hardship. Upon information and belief, the hospital did not engage in a meaningful interactive process because leadership was already set on terminating Plaintiff.

306.	Since there was insufficient evidence in Defendant CPE's FFD evaluation report to support termination, Broughton Hospital must have relied, at least in part, on the symptoms of Plaintiff's disabilities (ADHD and PTSD) to make its determination.

307.	There was, in any event, insufficient evidence to justify Plaintiff's termination, and Broughton's leadership acted with improper and unlawful motives.

308.	After Plaintiff was terminated, Largent was given Plaintiff's then-vacant position.

309.	Largent was less qualified than Plaintiff for that position.

310.	Largent had specifically informed Plaintiff that Largent did not know how to do the job, even though Largent had been doing it for eight years.

311.	Largent should have been terminated for her misconduct that was unbecoming of a supervisory role. At the very least, there was no legitimate reason to promote her.

## Post-Termination Harassment and Retaliation

312.	Despite filing her complaint with OAH much earlier, OAH did not make its final determination until June 30, 2023 (i.e., three days after Plaintiff was terminated). The OAH's determination was adverse to Plaintiff.

313.	Adopting the OAH determination, the EEOC did not conduct an independent investigation into the State's actions and issued Plaintiff a NRTS letter on August 16, 2023.

314.	In late February 2024, Plaintiff received a letter from Lisa Bare, Personnel Investigator at DHHS, informing Plaintiff that an allegation of misappropriation of patient funds against Plaintiff was posted on the Health Care Personnel Registry ("HCPR"). The misappropriation was alleged to have occurred on December 21, 2022.

315.	The complaint to the HCPR was undisputedly false. Plaintiff was on leave from Broughton between December 16, 2022 and January 14, 2023.

316. Once Bare confirmed those facts with Broughton Hospital, the complaint was rescinded and the investigation was closed without a finding against Plaintiff.

317. There was also no evidence that Plaintiff had ever misappropriated funds, as Plaintiff had never done so.

318. During the investigation, Plaintiff learned that the false allegations had been made anonymously by an employee of the Patient Advocacy Program ("Advocacy"), a separate entity located on Broughton Hospital's campus.

319. There was patient billing information in the Advocacy employee's complaint that could only have come from Broughton Hospital, as Advocacy did not have access to it (e.g., calculating daily rates for residents based on insurance and pay rates).

320. Plaintiff was informed by a trustworthy witness that Defendant Epley was having a sexual relationship with a female employee at Advocacy.

321. Upon information and belief, Defendant Epley directed his paramour to make the false complaint against Plaintiff to the HCPR and provided confidential information for her to do so.

322. For Defendant Epley, who Plaintiff believed to be narcissistic and very vindictive, such an act of retaliation could have been made eight months following Plaintiff's termination. That said, discovery is needed to learn when the complaint from Advocacy to the HCPR was actually made – While Plaintiff received the notice letter in late February 2024, the complaint could have been made several months earlier.

323. As a result of the HCPR complaint, Plaintiff was suspended from her new job on April 1, 2024, pending the outcome of the DHHS investigation.

41

324. Plaintiff was informed that CEO Streater has instructed certain employees, who are known but unnamed in this Complaint to protect them from retaliation, to not speak with Plaintiff.

325. Defendants knew their conduct toward, and treatment of, Plaintiff was wrong but nonetheless did it with intent to harm Plaintiff.

## Damages

326. Plaintiff was unfairly and wrongfully terminated from her position at Defendant DHHS, which resulted in monetary damages (including lost wages and benefits, and costs of searching for a new job).

327. Plaintiff lost time and money (including attorney's fees) defending against this false allegation. It was also very emotionally distressing that, once Plaintiff had finally begun to move on from the hostile work environment at Broughton Hospital, her co-workers' harassment and retaliation followed her to her new job.

328. Every time Plaintiff tried to move on from a set-back that was outside her control, she was unfairly and intentionally targeted without just cause.

329. Plaintiff suffered substantial harm as a result of Defendants' actions against her, including significant emotional distress.

330. Plaintiff was diagnosed with anxiety and depression, for which she has had to take medication, and was stressed to the point of chronic nausea. Her migraines became more frequent and intense.

331. Defendants knew about Plaintiff's existing health conditions and subjected her to the above-described mistreatment anyway, which exacerbated Plaintiff's symptoms.

332. Plaintiff's reputation was damaged.

**EEOC Charges and Plaintiff's Right-to-Sue; Administrative Exhaustion**

333.     Upon information and belief, Plaintiff filed three (3) separate EEOC charges of discrimination, harassment, and retaliation against Defendant DHHS (d/b/a Broughton Hospital) for continuing violations of the ADA (disability discrimination) and Title VII (race / color discrimination, sexual harassment, and retaliation).

334.     The fourth EEOC "charge" that State Defendants stated in their motion to dismiss was submitted on July 1, 2022 was actually only an inquiry submitted on July 1, 2023 that did not become a charge.

335.     Plaintiff also submitted inquiries on September 7, 2021, March 8, 2022, April 30, 2023, and July 1, 2023 in attempts to navigate the EEOC process and hold Defendants accountable.

336.     Plaintiff's first EEOC charge of discrimination was submitted on June 30, 2022 and amended on May 3, 2023 (with a NRTS letter issued on August 16, 2023).

337.     The second EEOC charge that Plaintiff submitted on August 5, 2024 (October 8, 2024 NRTS letter) involved new incidents of sex, disability, and race discrimination, harassment, and retaliation that were continuing violations of those asserted in the first EEOC charge.  Most importantly, Plaintiff added her wrongful termination claim that was not included in the first EEOC charge.

338.     The third EEOC charge was a summary of Plaintiff's prior two EEOC charges. This charge was submitted on December 18, 2024, with a NRTS letter issued on December 20, 2024.

339.     Therefore, the second and third EEOC charges amended the first EEOC charge because there were new violations that showed the same unlawful discrimination, harassment,

and retaliation were unaddressed and escalating in severity. The claims were continuing and accruing.

340. The wrongdoing that Plaintiff experienced at Broughton directly or indirectly stemmed from retaliation by Defendant Epley for Plaintiff rejecting his sexual advances and complaining about his sexual harassment and related retaliation.

341. Accordingly, the timely filing of this Complaint based on the second and third NRTS letters, and the continuing nature of the ADA and Title VII claims, make this entire Complaint timely filed.

342. If this Court determines otherwise, though it should not, Plaintiff was not represented by legal counsel for Broughton's internal grievance processes, OAH administrative proceedings, or the first two EEOC charges she filed, and the Court should allow her claims to proceed on the merits for the sake of equity and justice.

343. Based on her prior experiences with OAH (which had already adjudicated the sex and disability discrimination claims) and her termination, any further internal grievances or OAH proceedings would have been futile (especially after her termination). The OAH does not award monetary damages, which Plaintiff believed was necessary to compensate her for the harm she had experienced. The State Defendants' actions were patently illegal. For these reasons and more, administrative exhaustion should not be required for Plaintiff to pursue her claims fairly in this Court.

344. The OAH investigator also had a conflict of interest. The OAH investigator informed Plaintiff that the investigator was part of the State Employees Association of NC ("SEANC"). Knowing that SEANC was involved with Broughton on multiple occasions,

44

Plaintiff researched the investigator online and learned that the investigator shared multiple mutual friends with Largent, CEO Vivian Streater, and other staff at Broughton Hospital.

345.    To the extent administrative exhaustion might be required, the OAH had an opportunity to adjudicate Plaintiff's claims of race discrimination, constitutional violations, breach of contract, wrongful discharge in violation of public policy, attempted blacklisting, and post-OAH complaint acts of disability discrimination following Plaintiff's State complaint on July 11, 2023.  However, the OAH declined to do so, citing lack of jurisdiction, in a letter to Plaintiff dated July 19, 2023.

346.    The EEOC and OAH both provided Plaintiff was a lot of incorrect information, which resulted in certain claims (like ongoing harassment) not being included when Plaintiff was told she was amending a charge.  The EEOC investigator also did not tell Plaintiff until _after_ the EEOC and OAH determinations that she could not hear Plaintiff's audio recordings, which were very important to the case.  Had Plaintiff known, Plaintiff could have produced better copies.

347.    Plaintiff requested for the EEOC to perform a Substantial Weight review of the determination, but, despite all of the fatal flaws of the investigation, to no avail.

348.    Plaintiff had also been caring for her husband, who had been battling aggressive cancer and passed away following the filing of this Complaint.  These are rare and exceptional circumstances that the Court should consider.

349.    Regardless, Plaintiff should be allowed to pursue claims based on facts occurring up to 300 days before her EEOC complaint that was submitted on August 5, 2024.

## COUNT I

### Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964

### (Defendant DHHS Only)

350.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

351.     Plaintiff was subject to unwelcome sexual harassment by Defendant Epley, which sexual harassment was directed at Plaintiff.

352.     The harassment was based on Plaintiff's sex.

353.     Defendant Epley's sexual harassment of Plaintiff was both severe and pervasive enough to alter the terms, conditions, and privileges of Plaintiff's employment.

354.     Plaintiff's work environment was objectively and subjectively abusive, hostile and toxic as a result of Defendant Epley's sexual harassment.

355.     There is a strong basis for liability against Defendant DHHS because Broughton Hospital's leadership knew about the sexual harassment, were in a position to address it, and failed to respond effectively to stop the sexual harassment, remedy its effects, and prevent its reoccurrence.  In fact, the leadership enabled Defendant Epley (and employees at his direction) in ways that made the effects of sexual harassment worse for Plaintiff.

356.     Defendant Epley was acting within the scope of his employment at Broughton.

357.     As a direct and proximate cause of Defendants DHHS's actions, Plaintiff suffered (and continues to suffer) damages.

358.     As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

359. Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT II

### Disparate Treatment Race / Color Discrimination in Violation of Title VII of the Civil Rights Act of 1964

### (Defendant DHHS Only)

360. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

361. Plaintiff is a member of a protected class (race). Specifically, Plaintiff is white and Largent is black.

362. Plaintiff suffered adverse actions based on her race, which ultimately culminated in Plaintiff's termination.

363. Plaintiff was treated differently than a similarly-situated employee based on her race. Specifically, Plaintiff was subject to disparate and worse treatment in disciplinary processes because Defendant DHHS sought to avoid perceived potential race discrimination claims by a black employee who was involved in those processes. Upon information and belief, this would not have occurred if the other involved employee had been white, which is demonstrated by the treatment of other white supervisors in a similar position with an employee of the same race.

364. Following Plaintiff's termination, the involved black employee was given Plaintiff's position, despite being unable to perform the essential duties of the position and being a cause of issues in the department.

365. As a direct and proximate cause of Defendant DHHS's actions, Plaintiff suffered (and continues to suffer) damages.

47

366. As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

367. Discrimination based on race / color was not added until the third EEOC charge because Plaintiff was misinformed by the EEOC investigator who initiated the charge and Plaintiff was not represented by legal counsel. Plaintiff, who has no legal training, did the best she could and should not be prejudiced for any mistakes she made in a complex process.

368. Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT III

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**

**(Defendant DHHS Only)**

369. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

370. Plaintiff engaged in legally-protected action under Title VII.

371. State Defendants took adverse actions against Plaintiff, which adverse actions were likely to dissuade a reasonable employee from making or supporting the legally-protected action. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

372. State Defendants took the adverse actions because of Plaintiff's legally-protected complaints, thereby engaging in intentional retaliation in violation of Title VII.

373. Defendants Epley and Guy were acting within the scopes of their employments at Broughton.

374. Defendant DHHS knew about Defendants Epley's and Guy's retaliation and, not only failed to stop it but, participated in the retaliation such that Defendant DHHS must be held legally liable.

375. There was no legitimate, non-retaliatory reason for the adverse actions against Plaintiff.

376. As a direct and proximate cause of State Defendants' actions, Plaintiff suffered (and continues to suffer) damages.

377. As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

378. Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT IV

### Failure to Engage in the Interactive Process and Failure to Accommodate in Violation of Titles I and II of the Americans with Disabilities Act

### (Defendant DHHS Only)

379. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

380. Defendant DHHS is an "employer" subject to Title I of the ADA and a public entity subject to Title II of the ADA.

381. Plaintiff was, at all times relevant, an "employee" of Defendant DHHS, as defined by the ADA.

382. Plaintiff was, at all times relevant, a qualified employee with disabilities, a qualified employee regarded as disabled, or a qualified employee with a record of being disabled within the meaning of 42 USC § 12102.

49

383. The ADA mandates that such public entities and employers make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability, as stated in 42 USC § 12131(2) and 28 CFR § 35.130(b)(7).

384. Plaintiff required disability-related accommodations and services that were necessary to provide her with equal access to Defendant DHHS's services, programs, and activities.

385. Defendant DHHS had an ongoing duty to engage in an interactive process with Plaintiff to identify and implement necessary accommodations.

386. Defendant DHHS failed to engage in an interactive dialogue, assess the needs of Plaintiff, discuss potential accommodations, ensure that appropriate modifications were implemented, ignored requests to address accommodations, and refused to consider reasonable accommodations that would have addressed Plaintiff's disabilities. Specifically, Boison raised Plaintiff's need for accommodations in her letter to the hospital's leadership.

387. Defendant DHHS intentionally violated Plaintiff's rights under the ADA and its regulations by excluding her from participation in and denying them the benefit of Defendant DHHS's services, programs, and activities, on the basis of disability, and by subjecting them to discrimination in violation of 42 USC § 12132.

388. Defendant Guy purposely assigned tasks to Plaintiff that would be difficult in light of Plaintiff's disabilities, without a reasonable accommodation, to harass her and set her up for termination.

389. Inability to perform such tasks was given as a reason for her termination.

390.     Defendant DHHS intentionally treated Plaintiff differently on the basis of her disabilities.  Specifically, Defendant DHHS failed to engage in the interactive process and failed to accommodate Plaintiff because Defendant DHHS wanted to terminate Plaintiff and providing accommodations would have stood in the way of their goal.

391.     As a direct and proximate cause of Defendant DHHS's violation of the ADA, Plaintiff suffered (and continues to suffer) damages.

392.     As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on a second EEOC charge that amended the first.

393.     Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT V

### Violations of the 14th Amendment to the United States Constitution

### (Defendant DHHS Only)

394.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

395.     The 14th Amendment of the United States Constitution states that no person can be denied the equal protection of the laws (Equal Protection Clause, US Const. amend. XIV, § 1).

396.     Further, no state can deprive a person of life, liberty, or property without due process of law (Due Process Clause, US Const. amend. XIV, § 2).

397.     Defendant DHHS was, at all times relevant, a state government subject to the Equal Protection Clause and the Due Process Clause of the 14th Amendment of the United States Constitution.

51

398.    Defendant DHHS violated the Equal Protection Clause by engaging in disparate treatment discrimination against Plaintiff (including terminating Plaintiff) based on sex, race, and disability.

399.    Defendant DHHS failed to provide Plaintiff with due process in its disciplinary process (e.g., failure to provide a fair, objective, unbiased, process free from conflicts of interest, etc.), which resulted in an arbitrary and capricious outcome that deprived Plaintiff of her property interest in her state government employment and benefits.

400.    If Defendant DHHS had provided proper due process, the result of the disciplinary process would have been different.  Specifically, Plaintiff would have kept her job and returned to work.

401.    Defendant DHHS did not have legitimate reason for its actions (including the wrongful actions of State Defendants who were acting under color of state law).

402.    As a direct and proximate cause of Defendant DHHS's violations of the 14th Amendment of the United States Constitution, Plaintiff suffered (and continues to suffer) damages.

403.    Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT VI

### Wrongful Discharge in Violation of Public Policy (WDPP)

### (Defendants DHHS, Epley, and Guy)

404.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

52

405.     Plaintiff was subjected to sexual harassment, disparate treatment race discrimination, disability discrimination, retaliation, and a general hostile and abusive work environment by State Defendants.

406.     State Defendants knew of these serious issues and failed to take prompt and effective remedial action.  Further, Defendant DHHS was complicit in them.

407.     State Defendants made or entertained false and petty allegations, as well as violated Plaintiff's constitutional due process rights in the disciplinary process, with intent to fabricate "justification" for terminating Plaintiff despite having no legitimate reason to do so.

408.     Upon information and belief, State Defendants were orchestrating and driving Broughton Hospital's wrongful adverse actions against Plaintiff such that each should be held jointly and severally liable.

409.     Plaintiff was engaged in legally-protected activity when she refused to accede to Defendant Epley's unwelcome and inappropriate sexual advances, which are prohibited by NCGS § 143-422 (NC Equal Employment Practices Act); and when she complained of sexual harassment and related retaliation, race discrimination, and other activities which are prohibited by the NC Equal Employment Practices Act.

410.     Plaintiff was wrongfully discharged from her employment at Defendant DHHS.

411.     Plaintiff was discharged because of her engagement in one or more of the above legally-protected activities, each of which was a substantial factor in her termination.

412.     Defendant DHHS violated Plaintiff's due process rights guaranteed by the State Constitution when terminating Plaintiff, which violated public policy.

413.     Defendants Epley and Guy were acting within the scopes of their employments with Broughton.

53

414.    As a direct and proximate cause of State Defendants' actions, Plaintiff suffered (and continues to suffer) damages.

415.    Upon information and belief, Defendant DHHS has waived sovereign immunity.

416.    Defendants Epley's and Guy's actions were malicious, corrupt, or fraudulent, thereby depriving them of immunity.

## COUNT VII

### Attempted Blacklisting

### (Defendants DHHS and Epley)

417.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

418.    Plaintiff was an employee of Defendant DHHS, and Defendant DHHS discharged Plaintiff from its employ.

419.    Upon information and belief, Defendant Epley, without solicitation, by oral or written communication, unlawfully attempted to prevent Plaintiff from maintaining employment at another employer by making a false report of misappropriation of patient funds to the State's HCPR.

420.    Specifically, this claim is premised on intentional submission of a false complaint to harm Plaintiff, not on the performance of any public duties by the state or its employees.

421.    Upon information and belief, as a direct and proximate result of the actions by Defendant Epley (and / or his paramour at his direction), Plaintiff suffered (and continues to suffer) harm.

422.    Defendant Epley was acting within the scope of his employment, and Defendant DHHS is liable for Defendant Epley's actions.

423.     Defendant Epley's actions were malicious, corrupt, or fraudulent, thereby depriving him of immunity.

424.     Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT VIII

### Breach of Contract

### (Defendant DHHS Only)

425.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

426.     There was an employment contract between Defendant DHHS and Plaintiff.

427.     Plaintiff performed the employment contract.

428.     Defendant DHHS breached the employment contract.

429.     As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

430.     Defendant DHHS does not have immunity for its breach of a valid contract, as is the case here.

## COUNT IX

### Tortious Interference with Contract

### (Defendant CPE Only)

431.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

432.     There was a valid employment contract between Defendant DHHS and Plaintiff Campbell.

433. Defendant CPE knew there was an employment contract, or an employment relationship giving rise to Plaintiff Campbell's employment rights, between Defendant DHHS and Plaintiff Campbell.

434. Defendant CPE intentionally induced Defendant DHHS to find reason(s) to terminate the employment contract between Plaintiff Campbell and Defendant DHHS, which Defendant DHHS did, in fact, terminate.

435. Defendant CPE acted without excusable justification in doing so.

436. As a direct and proximate result of the actions by Defendant CPE, Plaintiff suffered damages.

## COUNT X

### Conspiracy

### (All Defendants)

437. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

438. Defendants conspired through agreement with each other, as well as with Largent and Lowery, to commit an unlawful act, and/or to commit a lawful act in an unlawful way, to effect Plaintiff's wrongful termination without cause.

439. Defendants committed an act in furtherance of the purpose of their agreement.

440. The acts committed by Defendants as part of their conspiracy were the direct and proximate cause of harm to Plaintiff.

441. As a result, there is a basis to hold Defendants jointly and severally liable for their wrongful conduct.

## COUNT XI

### Violations of the North Carolina State Constitution

### (Defendant DHHS Only)

442.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

443.     To the extent Plaintiff does not otherwise have an adequate remedy (due to failure of exhaust, untimely filings, or any other reasons), Plaintiff asserts her State constitutional rights.

444.     Article I, Section 19 of the North Carolina State Constitution prohibits the State from depriving a person of life, liberty, or property in an unlawful manner.  This section further protects persons from unequal protection of the law based on protected status, including race and color.

445.     Plaintiff had a property interest in her employment with the State.

446.     Defendant DHHS violated Article I, Section 19 of the North Carolina State Constitution by unlawfully depriving Plaintiff of her above-described rights to due process and equal protection of the laws when Defendant DHHS terminated Plaintiff.

447.     Article I, Section 14 of the North Carolina State Constitution provides the right to freedom of speech.  Plaintiff was unlawfully terminated for exercising this right.  Specifically, Plaintiff was complaining about matters of public concern related to unlawful discrimination, harassment, retaliation, and corruption within a State entity.

448.     Defendants Epley and Guy were acting under color of state law on behalf of the State.

449.     As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

450.    Defendant DHHS is not immune from liability for violating the North Carolina State Constitution.

## COUNT XII

### 42 U.S.C. § 1983

### (Defendants Epley and Guy)

451.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

452.    Defendants Epley and Guy were government officials acting under color of state law on behalf of the State.

453.    Defendants Epley and Guy violated Plaintiff's constitutional rights, as set forth above.

454.    Defendants Epley and Guy acted maliciously, corruptly, or fraudulently.

455.    As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

## COUNT XIII

### Punitive Damages

### (Defendants Epley, Guy, and CPE)

456.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

457.    Defendants Epley, Guy, and CPE acted willfully, wantonly, intentionally, wrongfully, with hostility, manipulatively, oppressively, and without any justification.  These Defendants have entirely and blatantly disregarded the law and all bounds of moral decency.

58

458.    As a result of the nature of these Defendants' actions, Plaintiff is entitled to punitive damages to the extent permitted by each applicable law.

459.    Punitive damages are necessary to punish these Defendants and deter future wrongdoing, which Plaintiff strongly believes is highly likely.

## PRAYER FOR RELIEF

**WHEREFORE**, based upon the foregoing, Plaintiff respectfully prays that:

1.    The Court find the Defendants liable to Plaintiff for their respective causes of action outlined above, or grant a jury trial on all issues so triable;

2.    Plaintiff have and recover of the Defendants, jointly and severally, compensatory damages (including loss of wages and benefits, damages for emotional distress, and harm to her reputation, etc.) to the extent permitted by law;

3.    Plaintiff have and recover of Defendants Epley, Guy, and CPE, jointly and severally, punitive damages to punish their wrongful actions, and to deter future misconduct;

4.    Plaintiff have and recover of the Defendants, jointly and severally, all other damages available under the laws and legal causes of action applicable to this Complaint;

5.    Plaintiff have and recover of the Defendants, jointly and severally, post-judgment interest at the 8.00% per annum legal rate from the date of judgment;

6.    Plaintiff have and recover of the Defendants, jointly and severally, reasonable attorneys' fees to the extent permitted by law;

7.    The costs of this action be taxed against the Defendants;

8.    Administrative exhaustion not be required;

9.    Deadlines and statutes of limitations be tolled;

10. The Court grant leave to amend to add additional plaintiffs and claims to promote justice; and,

11. The Court grant such additional and further relief as this Court deems proper and just.

Respectfully submitted on May 5, 2025.

*/s/ Ian M. McRary*

_____

Ian M. McRary
NC Bar #43057
McRary Law, PLLC
231 Government Avenue S.W., #1094
Hickory, North Carolina 28603
Phone: (828) 235-5551
Email: ian@mcrarylaw.com

William E. Morgan
NC Bar #35459
Morgan Law, PLLC
200 First Avenue NW, Suite 531
Hickory, NC 28601
Phone: (828) 855-3212
Fax: (828) 855-3214
Email: morgan@morganlaw.org

**ATTORNEYS FOR THE PLAINTIFF**