**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**No. 1:25-CV-00068-MR-WCM**

| | | |
|---|---|---|
| **LINDA CAMPBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **SECOND AMENDED COMPLAINT** |
| | ) | |
| **NORTH CAROLINA DEPARTMENT OF** | ) | **(Jury Trial Demanded)** |
| **HEALTH AND HUMAN SERVICES,** | ) | |
| **d/b/a BROUGHTON HOSPITAL; ET AL.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>COMPLAINT</u>

**NOW COMES** Plaintiff Linda Campbell, by and through her undersigned counsel to complain of Defendants as follows:

### <u>PARTIES</u>

1.      Plaintiff Linda Campbell is an adult at least 18 years old, and a citizen and resident of Morganton, North Carolina (which is located in this District).

2.      Plaintiff is a white female with disabilities.

3.      Plaintiff was an "employee" of Defendant North Carolina Department of Health and Human Services ("Defendant DHHS"), as defined by applicable law, where Plaintiff worked with (and, for a time, was supervised by) Defendant Epley.

4.      Defendant DHHS owned and operated Broughton Hospital, a psychiatric hospital in Morganton, North Carolina.

1

5. Defendant DHHS was an "employer", as defined by applicable law, which employed Plaintiff and Defendant Epley.

6. Broughton Hospital employed, at all times relevant, more than 15 employees.

7. Defendant Carl Epley is an adult at least 18 years old.

8. Defendant Epley is a white male.

9. Defendant Epley is a citizen and resident of North Carolina. Upon information and belief, Defendant Epley resides in this District.

10. At all times relevant, Defendant Epley was employed by Defendant DHHS at Broughton Hospital, where he supervised Plaintiff.

11. Defendant Marcus Guy is an adult at least 18 years old.

12. Defendant Guy is a citizen and resident of North Carolina. Upon information and belief, Defendant Guy resides in this District.

13. At all times relevant, Defendants Epley and Guy were employed by Defendant DHHS at Broughton Hospital, where Defendant Guy directly supervised Plaintiff for a time.

**JURISDICTION, VENUE, JOINDER, AND WAIVER OF SOVEREIGN IMMUNITY**

14. This Court has personal jurisdiction over the Defendants.

15. Defendant DHHS is engaged in substantial activity throughout the State, including in this District. Broughton Hospital's campus is located in this District (Morganton, North Carolina), which is where Plaintiff worked; where Defendants Epley and Guy work(ed); where, upon information and belief, Defendants Epley and Guy reside; where Plaintiff lives; and where most of the facts in this Complaint occurred.

16. This Complaint arises under, *inter alia*, 42 U.S.C. § 12131 *et seq*. (Titles II and III of the Americans with Disabilities Act of 1990, as amended), which prohibits discrimination on

the basis of disability, and 42 U.S.C. § 2000d *et seq*. (Title VII of the Civil Rights Act of 1964, as amended), which prohibits discrimination on the basis of race / color, and other federal claims.

17. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 (relating to federal question jurisdiction) and 28 U.S.C. § 1333(a)(3) (relating to equal rights actions).

18. To the extent that any claims set forth herein are not wholly within the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331-1333, this Court has supplemental jurisdiction over the remaining state court claims pursuant to 28 U.S.C. § 1367.

19. Venue in this Court is proper under, *inter alia*, 28 U.S.C. § 1391.

20. Joinder of claims is permitted under Rule 18 of the Federal Rules of Civil Procedure ("FRCP").

21. Joinder of parties is appropriate under FRCP 19 or 20.

22. By filing a joint petition for removal to this Court, which was granted, all Defendants voluntarily consented to this Court for purposes of personal jurisdiction, subject matter jurisdiction, and venue.

23. Upon information and belief, all pre-requisite conditions for filing this Complaint have been satisfied.

24. Upon information and belief, Plaintiff exhausted her administrative remedies before the United States Equal Employment Opportunity Commission ("EEOC"). Specifically, Plaintiff received her notice of right-to-sue letters ("NRTS") from the EEOC. This Complaint was timely filed within 90 days of the two latest-dated NRTS letters which amended the first NRTS letter due to new (as well as continuing and accruing) violations. Timely NRTS letters are attached as **Exhibit A**. Further explanation is set forth below.

3

25.     Upon information and belief, Plaintiff also exhausted her administrative remedies before the State by having the initial allegations of sex-, disability-, and race / color-based discrimination, harassment, and retaliation in her first EEOC charge adjudicated by the State's Office of Administrative Hearings ("OAH").  OAH determinations are attached as **Exhibit B**.

26.     Plaintiff submitted a complaint containing new allegations (including wrongful termination and other claims) in her second and third EEOC charges to the State's OAH, giving the OAH an opportunity to adjudicate.  The OAH declined to do so, citing lack of jurisdiction.

27.     The State's OAH does not have authority to award monetary damages and/or the full relief to which Plaintiff is entitled for the harm she suffered.  Defendant DHHS's actions were patently illegal discrimination, harassment, and retaliation such that Plaintiff should be permitted to pursue her claims in Court and the OAH investigator had a conflict of interest.

28.     Defendants' actions toward Plaintiff Campbell were malicious, corrupt, or fraudulent as evidenced by their personal animosity toward the Plaintiff and their personal intent to cause her harm through their repeated and willful actions taken against her during and after her employment.  Accordingly, Defendants are not entitled to immunity for their actions that are found to be committed as such.

29.     There was a valid employment contract between Defendant DHHS and Plaintiff Campbell.  By entering into this contract, Defendant DHHS waived its sovereign immunity and consented to be sued for breach of its contractual obligations.

30.     Upon information and belief, Defendant DHHS (d/b/a Broughton Hospital) has insurance that covers the claims asserted in this Complaint.  By carrying insurance, Defendant DHHS would have waived its sovereign immunity up to the extent of coverage.

4

31.     Defendants DHHS, Epley, and Guy (collectively, the "Defendants") waived sovereign immunity by voluntarily removing the Complaint to federal court.

32.     Defendants were engaged in proprietary actions that were not governmental functions and, therefore, are not entitled to immunity for such actions.

33.     To the extent adequate relief is not otherwise available (i.e., claims are barred by sovereign immunity, failure to exhaust administrative remedies, etc.), sovereign immunity does not bar Plaintiff Campbell's claims for violations of the North Carolina State Constitution.

34.     The facts and claims asserted in this Second Amended Complaint relate back to the date of the filing.

## FACTS

### Summary of the Case

35.     Plaintiff Linda Campbell worked as an Administrative Officer I for Defendant DHHS at Broughton Hospital in Morganton, North Carolina.

36.     Plaintiff worked in patient financial services, where Plaintiff supervised two employees (Catherine Largent and Jennifer Lowery).

37.     In 2018, while walking, Plaintiff was struck by the car of a Broughton co-worker who was driving under the influence of alcohol and illicit drugs.

38.     Plaintiff sustained serious injuries, including traumatic brain injury ("TBI") that impaired her nervous system and altered her personality.  In addition to attention-deficit hyperactivity disorder ("ADHD") and post-traumatic stress disorder ("PTSD"), Plaintiff developed difficulties typing (specifically, translating thoughts to correct word order, similar to Dyslexia), intense hyper-sexual behavior, and other neurological issues.

5

39. Plaintiff went out on Workers' Compensation leave for multiple different periods for treatments and recovery.

40. Plaintiff's indirect supervisor, Defendant Epley, knew Plaintiff was vulnerable due to effects of her TBI. Defendant Epley obtained Plaintiff's cell phone number under the false pretense of texting to ask how Plaintiff was doing.

41. Defendant Epley then promptly began sexting Plaintiff, attempting to solicit nude photos from her, and making sexual advances toward her.

42. Defendant Epley sent Plaintiff at least one "dick pic" as part of his sexual advances.

43. Defendant Epley also informed Plaintiff when she was out on Workers' Compensation leave that, when Plaintiff returned to work, Defendant Epley was going to be her new boss so they needed to have sex before it was too late.

44. Defendant Epley knew that Plaintiff was married.

45. After Plaintiff had successful therapies that healed many symptoms of her TBI, Plaintiff returned to work in spring 2021. Back to her normal mental state, Plaintiff promptly informed Defendant Epley that she was not interested in him and instructed him to stop making sexual advances toward her. Defendant Epley became visibly upset and was intent on making Plaintiff pay for turning him down – A huge blow to his ego.

46. Plaintiff supervised two employees in her department, Catherine Largent and Jennifer Lowery.

47. Plaintiff had previously worked with Largent for many years, and they had a cordial relationship without any issues.

48.     Lowery was a new employee.  Lowery was engaged to Largent's cousin and was the daughter-in-law of Bea Tullis (the head of the department who had just retired and was replaced by Defendant Epley).

49.     Largent was upset with Plaintiff for returning from Workers' Compensation leave, because leadership had promised Plaintiff's job to Largent if Plaintiff did not return.

50.     Ready to exploit Largent's frustration toward Plaintiff, Defendant Epley involved Largent and Lowery in a relentless campaign of retaliation and harassment against Plaintiff. Their retaliation and harassment are further detailed below.

51.     Through obstinate and disrespectful behavior; harassment and discrimination based on Plaintiff's disability; and numerous false and petty complaints that persisted about two years, Defendant Epley, Largent, and Lowery made every effort to get Plaintiff fired.

52.     Plaintiff made numerous complaints to Broughton's human resources department ("HR"), pleading for support.

53.     Broughton Hospital's leadership, under CEO Vivian Streater, did very little to support Plaintiff.  The actions of leadership were biased, unfair, and ineffective at stopping the continual harassment, discrimination and retaliation.  As a result, Plaintiff was unfairly placed on investigative leave multiple times for false allegations when Plaintiff was seeking help, only to return each time after the investigation found no evidence of wrongdoing by her.

54.     Broughton Hospital's leadership, unable to terminate Plaintiff for legitimate reasons, orchestrated a strategy for terminating Plaintiff based on trumped-up charges. Specifically, Defendant Guy (who, upon information and belief, was made Plaintiff's supervisor to come up with a "reason" to terminate Plaintiff) made false and defamatory statements claiming that Plaintiff had threatened him and was unfit for duty.

55. Broughton's leadership then relied on an objectively biased and false Fitness for Duty ("FFD") evaluation conducted by John F. Warren & Associates, d/b/a/ Complex Psychological Evaluations ("CPE"), which had undisclosed ties to Broughton, to wrongfully terminate Plaintiff.

56. On the other hand, leadership refused to take action against Largent, who was targeting Plaintiff, because Largent was black and Broughton's leadership considered doing so an "automatic lawsuit."

57. When Plaintiff's treatment provider at NC Neuropsychiatry wrote a letter disputing the findings in Plaintiff's FFD evaluation (pointing out the obvious flaws and bias in CPE's report, as well as the psychiatrist's conflict of interest), Broughton Hospital's leadership disregarded that letter.

58. Likewise, when Plaintiff's treatment provider recommended that Plaintiff return to work with reasonable accommodations for her disabilities and provided some options. Broughton Hospital did not engage in an interactive process and responded (incorrectly) that any accommodations would be an undue burden.

59. While the lack of accommodations made work more difficult, Plaintiff's job performance was still satisfactory.

60. Plaintiff's last VIP review stated that all of Plaintiff's work was submitted on time and there were no issues with her performance. An email and a recording from Defendant DHHS stated that Plaintiff went above and beyond in performing her work duties.

61. Broughton Hospital – unduly influenced by Defendant Epley, and signed off on by CEO Streater – was set on terminating Plaintiff no matter what. Plaintiff never had a fair chance.

8

62.     After Plaintiff was gone, an employee of Advocacy (a separate entity affiliated with Broughton Hospital) made a false complaint about Plaintiff to the HCPR, falsely alleging that Plaintiff had misappropriated patient funds during a period when Plaintiff was out on leave. There was information in the false complaint that could only have come from inside Broughton Hospital.

63.     Upon information and belief, the complainant at Advocacy was a woman who was having sex with Defendant Epley that had made the complaint at Defendant Epley's request.

64.     Plaintiff was, pursuant to her new employer's policy, suspended yet again pending the outcome of an investigation that should not have happened.  Like every investigation before it, there was no finding of wrongdoing by Plaintiff.

65.     The harassment and retaliation that Plaintiff experienced at Broughton Hospital went well beyond a hostile work environment – It was severe, pervasive, intentional, unfair, and outside all bounds of moral decency.  Broughton Hospital had many opportunities to do the right thing and stop it, but its leadership refused to do so because Broughton's leadership was unduly influenced by Defendant Epley and fear of a race discrimination lawsuit.  Plaintiff has suffered substantial harm as a result.

66.     The facts below, which will be proven with multiple audio recordings, witness testimony, and other documents, show that Plaintiff suffered greatly, at the hands of Defendants. Plaintiff trusts this Court to make right the wrongs she suffered.

**Background Facts (Including Sexual Predation by Defendant Epley)**

67.     In or around August 2010, Plaintiff began working for Defendant DHHS as a certified nursing assistant at Broughton Hospital.

9

68.     Broughton Hospital is a state-owned and -operated psychiatric hospital under Defendant DHHS, located in Morganton, North Carolina.

69.     Plaintiff had a valid employment contract with Defendant DHHS.

70.     Plaintiff satisfactorily performed her job duties and demonstrated her value to Broughton Hospital.

71.     In December 2016, Plaintiff accepted a position as Administrative Officer I at Broughton Hospital.  Plaintiff performed duties related to patient financial matters within the hospital, which included reviewing patient ability to pay; evaluating Medicare, Medicaid, and commercial insurance coverage; overseeing reimbursement; and maximizing receipts.

72.     On October 8, 2018, Plaintiff was struck by the car of a Broughton Hospital employee who was driving under the influence of alcohol and illicit drugs on Broughton Hospital's campus and sustained serious injuries, including a TBI that impaired her nervous system and drastically altered her personality.

73.     Plaintiff's TBI caused post-concussive headaches and migraines, vertigo, mood instability, impulsivity, panic attacks, anxiety, memory and attention deficits, PTSD, and intense hyper-sexual behavior, among other symptoms.  Plaintiff's personality was obviously different than normal.

74.     Plaintiff was out of work from October 9, 2018 to October 14, 2018.

75.     Plaintiff attempted a return to work on October 15, 2018.

76.     Plaintiff, at all times relevant, both before and after the accident, was qualified for her position and satisfactorily performed her job duties.

77.     Plaintiff was, at all times relevant, married.

78.     Plaintiff's indirect supervisor, Defendant Epley, recognized the ways in which Plaintiff was vulnerable following the accident, including Plaintiff's intense hyper-sexual behavior.

79.     Defendant Epley obtained Plaintiff's cell phone number and texted Plaintiff to ask how she was doing.

80.     Defendant Epley soon began texting Plaintiff to compliment her beauty.

81.     Defendant Epley's texts then turned sexual, with Defendant Epley making strong and persistent sexual advances toward Plaintiff, as well as asking very personal sexual questions of Plaintiff.  This led to sexting on multiple occasions.

82.     Defendant Epley attempted to solicit nude photos from Plaintiff on numerous occasions.

83.     Defendant Epley texted at least one nude photo of himself to Plaintiff. Specifically, a "dick pic."

84.     Defendant Epley's persistent sexual advances wore Plaintiff down in her vulnerable mental state to the point she reluctantly gave in to some sexting.  Plaintiff has felt guilty about it since.

85.     After receiving Workers' Compensation coverage for her serious injuries, Plaintiff again took Workers' Compensation leave on October 18, 2018.

86.     Plaintiff returned to light duty work on November 13, 2018, and then to full duty work on December 17, 2018.

87.     Plaintiff was placed back on Workers' Compensation leave on November 12, 2020.

88.     The above periods of Workers' Compensation leave were necessary for Plaintiff to receive treatment for, and recover from, the serious injuries she sustained in the accident on October 8, 2018.

89.     While Plaintiff was on Workers' Compensation leave, Defendant Epley (Plaintiff's indirect supervisor) tried on numerous occasions to convince Plaintiff to meet so they could have sex.

90.     Plaintiff resisted, so she and Defendant Epley never had sex.

91.     During this time, Plaintiff suffered from post-concussive syndrome, cognitive impairment, and hyper-sexual behavior, making her unable to fully comprehend her actions with Defendant Epley or refuse his sexual advances.

92.     If Plaintiff had not been suffering from the TBI, Plaintiff would not have been interested in Defendant Epley or sexted with him (and Plaintiff had not done so or had any interest in Defendant Epley before the accident).

93.     In spring 2021, Plaintiff received certain therapies (hyperbaric oxygen chamber and neuro-feedback) at Apex Brain Center.  The therapies were successful in alleviating most of her symptoms.

94.     After Plaintiff was treated by Apex Brain Center, Defendant Epley texted Plaintiff to ask whether she was "still crazy."  Plaintiff responded no.

95.     Around the same time, Defendant Epley informed Plaintiff that their boss (Bea Tullis) was retiring and Defendant Epley would be taking over the position (with Defendant Epley being Plaintiff's official boss).

96. Defendant Epley put more pressure on Plaintiff to have sex with him. Defendant Epley specifically stated that they needed to have sex before Defendant Epley became Plaintiff's boss because, then, "it would be too late."

97. Upon information and belief, Defendant Epley has had sexual relations with multiple female employees throughout Broughton Hospital.

98. Upon information and belief, Defendant Epley has been caught having sex at work by maintenance workers.

99. Upon information and belief, Defendant Epley had sex with at least one female employee at Advocacy, a separate entity located on Broughton Hospital's campus.

100. Plaintiff, back to her normal mental state, informed Defendant Epley that she was not interested in him and that Defendant Epley needed to stop making sexual advances toward her.

101. Plaintiff was optimistic about returning to work.

102. Plaintiff loved her job, had recovered from her TBI and most of its symptoms after a long struggle, and thought she had ended things with Defendant Epley. In short, Plaintiff was looking forward to putting the past behind her and things returning to normal like before the car accident.

103. Plaintiff returned to light duty work on May 24, 2021, and then to full duty work on June 4, 2021, with Defendant Epley as her new boss.

104. One day, during a conversation with Defendant Epley, Plaintiff mentioned that she had not really wanted to have sex with Defendant Epley and that she had recovered to her normal self.

13

105.    Defendant Epley became visibly upset when Plaintiff reiterated her lack of interest in him.

106.    Upon information and belief, Defendant Epley is narcissistic. Plaintiff communicating her lack of interest in him was an intolerable blow to his ego.

### Two-Year Campaign of Harassment and Retaliation

107.    After Defendant Epley became Plaintiff's boss and Plaintiff informed Defendant Epley that she was not interested in him, Defendant Epley began a relentless campaign of retaliation against Plaintiff at Broughton.

108.    Plaintiff was, at all times relevant, a good employee who satisfactorily performed her job duties and was loyal to Broughton Hospital.

109.    Plaintiff supervised two employees named Jennifer Lowery and Catherine Largent.

110.    Prior to Plaintiff expressing her lack of interest to Defendant Epley, Plaintiff and Largent had worked together since 2014 and had a cordial relationship.

111.    Lowery was a new employee to the department who had been friends with Largent outside of Broughton Hospital. Lowery was engaged to Largent's cousin. Lowery was also Tullis' daughter-in-law.

112.    There are multiple employees at Broughton, including Lowery, who were hired based on nepotism.

113.    Defendant Epley, who had also worked with Largent for several years, turned Largent and Lowery against Plaintiff.

114.    Upon information and belief, Defendant Epley promised Largent a promotion in return for assisting him with retaliating against Largent.

14

115.    Examples of retaliation include, but are not limited to, the following:

a.      In June 2021, Plaintiff's keys were stolen and she was required to pay $125.00 for a new set of keys.  About a week later, the key was found in Lowery's training books.  Lowery was off the day the keys went missing.  Upon information and belief, Defendant Epley or Largent had stolen Plaintiff's keys and hid them there.

b.      In August or September 2021, Largent complained that Plaintiff had asked to look in Largent's pocketbook and that Plaintiff was treating Largent differently because Largent was black, which was false.  Defendant Epley investigated Largent's complaint and, despite no supporting evidence, issued Plaintiff a write-up on September 16, 2021.  The write-up also falsely stated that Plaintiff had yelled at Largent when, in fact, Largent had yelled at Plaintiff.  The investigation was unfair and biased – Defendant Epley had created an opportunity to target Plaintiff.  Defendant Epley mischaracterized the incident, improperly citing Plaintiff for violating policy, disrupting the workplace, and interacting with others in an inappropriate, discourteous, and unprofessional manner.  As explained in more detail below, this write-up was later retracted once leadership learned about Defendant Epley's undisclosed conflict of interest and misconduct toward Plaintiff.

i.The investigation was completely biased and unfair because it was done by Olga Propst, a black employee and friend of Largent, and Defendant Epley.

15

ii. Plaintiff did not "appeal" the write-up (i.e., there was no appeal option, but Plaintiff could have filed a grievance against the write-up / investigators) because it was given to her the work-day before she went out on approved FMLA leave for 30 days for her husband's serious medical condition (aortic valve surgery). While Plaintiff was out, Plaintiff missed the grievance deadline. Defendants knew the grievance deadline was during Plaintiff's FMLA leave, yet did not extend the deadline. When Plaintiff spoke with Defendant Epley about a grievance upon her return, Defendant Epley told Plaintiff it was too late to appeal.

c. After Defendant Epley became Plaintiff's boss, Largent and Lowery suddenly grew obstinate and insisted they did not need to listen to Plaintiff. They also pretended they did not know how to do things they knew how to do for the purpose of harassing Plaintiff.

d. Largent and Lowery were purposely insubordinate toward Plaintiff, which Defendant Epley and other leaders exacerbated when they failed to effectively respond to Plaintiff's multiple complaints.

e. Largent complained to Defendant Epley that she thought Lowery had been talking to Plaintiff about Largent in Plaintiff's office behind Largent's back. As a result, Largent demanded that Defendant Epley instruct Plaintiff to keep her office door open. Yet, when a former employee had accused Largent of talking about the former employee in the same manner, Largent stated that it was a "petty" reaction. Despite Plaintiff's need to meet privately with employees on certain matters, Defendant Epley instructed Plaintiff to leave the door open.

16

f.      Defendant Epley often met privately with Largent and Lowery.  Upon information and belief, to make Plaintiff feel isolated and to discuss ways to harass and, ultimately, get rid of Plaintiff.

g.      In July 2021, Largent again complained about Plaintiff for having window tint in her office because Largent could not see whether Plaintiff was in there (i.e., the tint was added to help prevent Plaintiff's migraines when she was still suffering from the TBI).  Defendant Epley again sided with Largent, making Plaintiff remove the window tint.  Yet Largent also had window tint and was allowed to leave it up.

h.      On multiple occasions when Plaintiff closed her office blinds, Defendant Epley stood in the hallway so as to get Largent's attention and then opened them without speaking to Plaintiff.  Defendant Epley did not do this to other employees, only Plaintiff.  Defendant Epley knew it upset Plaintiff.  Moreover, the primary reason Plaintiff was closing her blinds in the first place was to prevent Defendant Epley from constantly staring in them, which was creepy and intimidating to Plaintiff.

i.      Defendant Epley assigned Plaintiff less favorable, and unfair, work assignments (often to the benefit of Largent).

j.      Largent obstinately refused to sign Plaintiff's VIP review of Largent, despite not expressing any issues with the review.  Largent stated that Defendant Epley said Largent did not have to sign it, which, upon information and belief, is true.

17

k.    Defendant Epley routinely undermined Plaintiff in front of others, including Largent and Lowery.  For instance, Defendant Epley was very rude to Plaintiff in a departmental meeting with Reba Yancey for no legitimate reason.  Yancey commented about it to Plaintiff after the meeting.

l.    In February 2022, Largent refused to assist Lowery with a Medicaid application as Plaintiff had instructed.

m.    In February 2022, Largent stopped signing a check-list on patient paperwork as Plaintiff had instructed, and Largent told Lowery to do the same.

n.    Largent repeatedly questioned and criticized Plaintiff's instructions with Defendant Epley and Lowery, without discussing with Plaintiff.

o.    Largent complained she couldn't see Plaintiff because it was too dark with just the lamp on and she needed to turn on more lights.  Largent was aware of Plaintiff's disability which caused sensitivity to lights and associated migraines.  Largent previously kept her office the same way but complained solely to harass Plaintiff.

p.    Lowery falsely alleged that Plaintiff was going to "shoot up the place."

q.    Lowery falsely alleged the Plaintiff would not let Lowery leave Plaintiff's office.

r.    On February 24, 2022, Defendant Epley informed Plaintiff that Plaintiff's position on the budget list had dropped as a result of Defendant Epley's aforementioned retaliatory write-up of Plaintiff, so Plaintiff's pay-rate may be negatively impacted.  Defendant Epley stated that what Plaintiff had done was

18

really bad.  Before Defendant Epley's retaliatory write-up, Plaintiff was ranked at the top for pay increase and should otherwise have received one.

s.      The above actions by Defendant Epley, Largent, and Lowery would typically have resulted in discipline at Broughton Hospital, but they were afforded more favorable treatment by Broughton's leadership.  However, Plaintiff was targeted for discipline on multiple occasions based on false allegations.  The false allegations often resulted in Plaintiff being suspended.  When Plaintiff made complaints, they largely went unaddressed and responses were ineffective at stopping wrongful conduct directed at Plaintiff.

t.      Largent and Lowery would disappear for hours without notifying Plaintiff.

116.    Lowery informed Plaintiff that Bea Tullis (and, upon information and belief, Defendant Epley) had promised Plaintiff's job to Largent while Plaintiff was out on Workers' Compensation leave, so Largent was angry that it did not happen.

117.    Largent received an $8,000 pay-raise for which Plaintiff was not considered, which was unfair because they were supposed to be reviewed for a pay-raise at the same as part of the same department.

118.    Lowery also informed Plaintiff that Defendant Epley and Largent were actively working together to get Plaintiff fired.

119.    Lowery stated that Defendant Epley and Largent were closely scrutinizing Plaintiff and writing down everything to use to get Plaintiff fired.

120.    Lowery then apologized for her own actions and told Plaintiff that Defendant Epley and Largent had pressured her to complain about Plaintiff.

19

121.    Plaintiff asked Defendant Epley on numerous occasions to stop harassing her, because Plaintiff could not handle much more.

122.    Defendant Epley had seen Plaintiff upset and crying from the retaliation, yet Defendant Epley continued unabated.

123.    Upon information and belief, Defendant Epley did not think Plaintiff would complain about him because Plaintiff would not want information about her and Defendant Epley sexting to come out, especially since Plaintiff was married.

**Plaintiff's Complaint Against Defendant Epley**

124.    Plaintiff eventually became so emotionally distraught from the relentless harassment and retaliation orchestrated by Defendant Epley that Plaintiff made an internal complaint against Defendant Epley.

125.    On March 13, 2022, Plaintiff emailed Candice Justice (Assistant Human Resources Manager) and Alicia Nexsen (Employee Relations Specialist) requesting to meet privately to discuss issues in her department.

126.    A meeting was scheduled for the next day, with Defendant Epley invited.

127.    The next day, on March 14, 2022, Plaintiff deleted the meeting invite.  Plaintiff emailed Justice and Nexsen that Plaintiff did not want Defendant Epley to see the meeting invite.

128.    During the meeting, Plaintiff provided Justice and Nexsen with a written report of concerns about Defendant Epley and Largent.

129.    On March 16, 2022, Justice and Nexsen forwarded Plaintiff's complaint to CEO Streater, who called for an investigation.  The investigation team included the spouse of an HR employee and the Quality Risk Director who worked closely with CEO Streater and Defendant Epley.

130. Defendant Epley and CEO Streater have a very close relationship, and Defendant Epley has substantial influence over CEO Streater's decision-making.

131. Upon information and belief, Defendant Epley and CEO Streater exerted undue influence on the internal investigation against Plaintiff and chose investigators who would be biased in favor of Defendant Epley.

132. On March 22, 2022, Plaintiff requested that Defendant Epley be reassigned to a different area of the hospital while the investigation was pending.

133. On March 29, 2022, Plaintiff was reassigned and began reporting to Reba Yancey (Business Officer II) at a the same location in the same administrative building.

134. CEO Streater stated that Plaintiff's reassignment to Yancey was permanent.

135. During the investigation, Plaintiff continued to be a good employee who satisfactorily performed her job duties without disciplinary or attendance issues.

136. Plaintiff and Yancey had a great working relationship.

137. Yancey informed CEO Streater that Plaintiff was a great employee who did everything Yancey requested.

138. On April 13, 2022, the investigators informed CEO Streater that they did not substantiate Plaintiff's allegations but had identified certain areas for improvement regarding interpersonal interactions and communication between employees in the department.

139. There was sufficient information to substantiate Plaintiff's allegations, but, upon information and belief, the investigators (who were internal employees acting in the hospital's interests) were unduly influenced to not make findings that resulted in discipline for Defendant Epley.

140.    Defendant Epley admitted during the investigation that Defendant Epley had sexted Plaintiff and sent the dick pic.

141.    Investigators also found that Defendant Epley failed to disclose to HR his prior relationship with Plaintiff.

142.    Despite the above findings, upon information and belief, Defendant Epley was not appropriately disciplined – He was only assigned training classes.

143.    Training classes were an insufficient and ineffective response by the hospital. As a result, leadership enabled and empowered Defendant Epley's behavior, which continued.

144.    On April 29, 2022, CEO Streater and one of the investigators met with Plaintiff to communicate the outcome of the investigation. CEO Streater expressed an intention to address identified concerns and improve working relationships.

145.    Plaintiff was told she was "permanently" reassigned to Yancey, effective April 29, 2022.

146.    Defendant Epley's improper write-up of Plaintiff on September 16, 2021 was also inactivated.

147.    Plaintiff asserts that the investigators had sufficient information from the investigation to support her complaint; however, the investigators were biased toward protecting Broughton Hospital and Defendant Epley from discipline and facts reflecting poorly on them.

148.    The investigators intentionally sought to find a "middle-ground" that responded to Plaintiff's concerns without finding the respondent (Defendant Epley) had done anything wrong.

149.    Such a "middle ground" outcome that protects Broughton and its leadership is common at Broughton, resulting in serious concerns not being effectively addressed.

150.	Yancey stated her belief that, once Defendant Epley was removed from the department, Largent would no longer have any issues with Plaintiff.

151.	Plaintiff informed Yancey that Plaintiff was relieved to finally be free from Defendant Epley's control, harassment, and retaliation.

152.	Defendant Epley was promoted to Broughton's chief financial officer ("CFO").

153.	In responses to Plaintiff's complaints, Defendant DHHS cited different dates for Defendant Epley's promotion. Specifically, Defendant Epley informed Plaintiff that his promotion occurred on July 1, 2021. The OAH investigator found that it occurred in May.

### Continued Harassment and Retaliation

154.	Defendant Epley informed Yancey separately that "nothing had changed for now" because Defendant Epley, as CFO, will still review and sign off on all of Plaintiff's work.

155.	Unfortunately, Defendant Epley was right. Broughton Hospital's actions did not stop Defendant Epley's continued control, harassment, and retaliation of Plaintiff.

156.	In May and June 2022, Defendant Epley began looking for reasons and ways to enter Plaintiff's new work location.

157.	On June 1, 2022, Yancey received complaints about Defendant Epley from both Plaintiff and one of Yancey's employees named Kathy Franklin.

158.	In one day, Defendant Epley walked past Plaintiff's new office at least 20 times while staring in at Plaintiff.

159.	Defendant Epley went by Franklin's cubicle multiple times and asked her "off the wall" questions that had nothing to do with their jobs, while staring over at Plaintiff as he was talking with Franklin.

160. When Plaintiff went over to talk with another employee, Kim Moody, Plaintiff caught Defendant Epley staring at Plaintiff there, too.

161. Plaintiff, very upset, went to Yancey to ask when Defendant Epley would be moved because Plaintiff was tired of still being harassed and intimidated on a constant basis.

162. CEO Streater appeared to neglect Plaintiff's concerns about Defendant Epley, despite being substantiated by objective witnesses like Yancey and Yancey's employees.

163. On one occasion, CEO Streater downplayed the concerns by stating that Defendant Epley was only "conducting normal business activities and utilizing the copier."

164. Many times, Defendant Epley was not even holding a piece of paper (to copy or that had been printed).

165. As a result of CEO Streater's ineffective response, Plaintiff was more intimidated and continued to experience harassment by Defendant Epley.

166. In late June 2022, it became clear to Plaintiff that Broughton's leadership was not promptly or effectively addressing her complaints.

167. In early July 2022 (about three months after Plaintiff's initial complaint on March 13, 2022 had not been addressed), Defendant Epley was finally moved into a new office away from Plaintiff.

168. CEO Streater's unnecessary delay in relocating Defendant Epley and refusal to listen to Plaintiff's serious concerns contributed to Plaintiff's emotional distress during that time.

169. On August 18, 2022, Lowery complained about Plaintiff, stating that there was minimal communication within the department and said communication was "draining."

170. Lowery could not perform the essential duties of her position, but Lowery was afforded deference and protection when Plaintiff raised concerns with Lowery's performance.

171. On September 7, 2022, Plaintiff emailed Nexsen and requested to meet about department issues. During the meeting, Plaintiff discussed ongoing concerns in her department. Specifically, that the harassment by Lowery and Largent had not stopped. There were also concerns with Largent's and Lowery's poor performance, which were part of the harassment.

172. On September 9, 2022, Nexsen and Justice forwarded Plaintiff's concerns to CEO Streater.

173. Upon information and belief, there was no investigation or effective response to Plaintiff's concerns.

174. On September 9, 2022, Plaintiff sent an email to HR and went to HR in person about a false allegation Largent made against Plaintiff involving notes. Largent and Lowery went to a social worker to try to persuade the social worker to lie to back up Largent's story.

175. Largent was not disciplined for her false allegation or cover-up.

176. Largent would leave her office for long periods of time, and she took vacation, without notifying Plaintiff. Notification was required by policy for safety reasons. However, Largent was not disciplined for doing so.

177. Largent was granted a special privilege agreement that allowed her to notify Defendant Epley of her schedule instead of Plaintiff, her supervisor. There was not a legitimate reason for such a special privilege.

178. On October 19, 2022, Plaintiff emailed Nexsen and Justice to request another meeting concerning the ongoing issues with Largent.

179. On October 28, 2022, Plaintiff emailed Nexsen and Justice to inform them that Plaintiff and Yancey were holding weekly meetings and training to help resolve the situation with Largent.

25

180.    The same day, on October 28, 2022, Largent complained to Nexsen and Justice about Plaintiff.  Specifically, Largent thought Plaintiff was going to try to terminate Largent for poor work performance and insubordination.

181.    On November 1, 2022, because Broughton Hospital's leadership had failed to promptly, equitably, and effectively address the situation, CEO Streater, Nexsen, and Justice met with the state's assistant attorney general, Hilary Ventura, to discuss Largent and develop an action plan.

182.    On December 16, 2022, Lowery complained that, early the same day, Plaintiff had exposed her breasts and hip area to Lowery in the workplace.  This was a lie and never happened.

183.    Lowery also stated that Plaintiff had threatened to bring a gun to work and kill everyone, which was also a lie and never happened.

184.    Upon information and belief, Lowery made these false complaints in an effort to distract from concerns with her own poor performance, to harass Plaintiff and, ultimately, to get Plaintiff terminated.

185.    Plaintiff was very confused because Lowery had first participated in the harassment against Plaintiff, then apologized and blamed Defendant Epley and Largent (i.e., Lowery later sent Plaintiff a text that stated, "I love you sweet lady!!"), and then went back to harassing Plaintiff by making false allegations to leadership in an apparent attempt to get Plaintiff terminated.

186.    Upon information and belief, Defendant Epley and Largent were pressuring Lowery to attack Plaintiff.

187.     On December 16, 2022, Plaintiff was placed on investigative leave with pay so Lowery's complaint could be investigated.

188.     CEO Streater brought in Heather Brewer (Assistant Director for Hospitals) and Karen Burkes (Division Director) to assess the situation.

189.     On December 20, 2022, Burkes assigned Brewer and Kimberly Kennedy (School Administrator) to investigate Lowery's complaint.

190.     On January 4, 2023, the investigators concluded there was insufficient evidence to support any of the allegations in Lowery's complaints.

191.     On January 14, 2023, Plaintiff was reinstated.  Plaintiff returned to work on January 17, 2023.

192.     Despite no finding of wrongdoing against Plaintiff and the issues being caused by Largent and Lowery (not Plaintiff), CEO Streater stripped Plaintiff of supervisory duties, reduced her responsibilities, and changed her job title without minimal due process or a finding of wrongdoing.

193.     CEO Streater claimed that no due process was required because Plaintiff's job classification and pay remained the same.

194.     Upon information and belief, CEO Streater's actions were part of Streater's strategy to ultimately terminate Plaintiff.

195.     Yancey informed CEO Streater that, if Yancey was not removed from the situation involving Largent and Lowery's harassment of Plaintiff, Yancey was going to quit.

196.     Despite CEO Streater stating that Plaintiff's reassignment to Yancey was permanent, CEO Streater moved Plaintiff's department under Defendant Marcus Guy.

197.     Defendant Guy was supposedly tasked with restoring harmony to the department.

27

198.    Defendant Guy informed Plaintiff in a private meeting that "HR adds no value."

199.    Defendant Guy stated the situation with Lowery and Largent was a "shit storm."

200.    Yancey had informed leadership, including CEO Streater, that Plaintiff had been a great employee and the problems were caused by Largent and Lowery.

201.    Rather than address the real cause of the problems, CEO Streater kept Plaintiff, Largent, and Lowery together and never took appropriate disciplinary action against Largent or Lowery.

202.    Due to CEO Streater's failure to take appropriate action to address the harassment and retaliation, which CEO Streater knew about, Plaintiff continued to suffer harm.

203.    Defendant Guy had very close relationships with CEO Streater and Defendant Epley.

204.    Upon information and belief, Defendants Guy and Epley had significant influence over CEO Streater's decision-making.

205.    Upon information and belief, Defendant Guy's real task was to appear to be objective while contriving a reason to terminate Plaintiff, under the influence and/or direction of CEO Streater and Defendant Epley.

206.    Defendant Guy had been used in this way to effectuate termination of at least one other employee before at Broughton.

207.    Defendant Guy told Plaintiff in a private meeting that he would "bring troubles down upon [employees'] head[s]" until they quit.

208.    Defendant Guy's statement in the above paragraph intimidated Plaintiff.

209.    Plaintiff and Defendant Guy previously had a good relationship, and Defendant Guy had complimented Plaintiff's work performance.

210.     That good relationship changed once it became apparent that Defendant Guy was trying to find a way to wrongfully terminate Plaintiff.

211.     Defendant Guy intentionally tried to discourage Plaintiff.  As an example, Defendant Guy knew that, as a result of the workplace accident that resulted in Plaintiff's TBI, Plaintiff was still slower at typing and word processing.  Plaintiff sometimes typed words backwards and then had to correct them.

212.     Defendant Guy publicly criticized Plaintiff's writing in a meeting, which included Largent and Lowery, while smirking at Plaintiff.

213.     Defendant Guy assigned Plaintiff multiple lengthy writing assignments, including drafting a policy manual, and then complained about how long Plaintiff took to complete them.

214.     Defendant Guy did not offer Plaintiff any accommodations or assistance for the effects of Plaintiff's disabilities.

215.     Plaintiff requested that those types of assignments be given to others for Plaintiff to supervise, consistent with their job duties, but Defendant Guy responded that only Plaintiff could do them.

216.     Despite Defendant Guy's harassment of Plaintiff, Plaintiff satisfactorily performed these duties (despite the increased difficulty) and did not quit.

217.     Defendant Guy told Plaintiff that her being a team-player and caring worked against her.

218.     Upon information and belief, Defendant Guy was trying to dissuade Plaintiff from being a caring team-player to create another reason to terminate her.

219.     Defendant Guy, in multiple private meetings with Plaintiff, engaged in gaslighting and intimidation of Plaintiff.

29

220. In one meeting, Defendant Guy stated to Plaintiff: "You don't want to know the depths of me. I am a monster. But, I keep it in the cage."

221. Defendant Guy led Plaintiff to believe that he took over the department to get sufficiently documentation to move Largent and Lowery when, in fact, he was there to effectuate termination of Plaintiff.

222. Plaintiff was confused and intimidated by Defendant Guy's statements, which came across as threatening and intimidating.

223. Defendant Guy held weekly meetings with Plaintiff, Largent, and Lowery.

224. In one meeting, Largent and Lowery both "blew up" with angry outbursts. Largent yelled at Plaintiff and stated that Plaintiff cannot use her disability to make people feel sorry for her. Lowery then yelled that Plaintiff was a liar.

225. Despite Largent and Lowery's angry outbursts, Defendant Guy stated that Plaintiff remained calm and composed.

226. Defendant Guy ended the meeting and reported what happened to CEO Streater. Defendant Guy stated that Largent and Lowery "attack[ed]" Plaintiff.

227. When Defendant Guy was unsuccessful in finding a legitimate reason to terminate Plaintiff or making Plaintiff resign, Defendant Guy reported to CEO Streater that, during a meeting between Defendant Guy and Plaintiff in late February 2023, Plaintiff stated, "[Streater] betrayed me and if you betray me, I'll cut you like I cut myself."

228. CEO Streater called for another investigation of Plaintiff.

229. Defendant Guy had taken the term "cut" from a text that Plaintiff had sent to Defendant Epley, in which Plaintiff stated that Defendant Epley first wanted to have sex with her and then wanted to "cut" (meaning, harm) her.

30

230.    Upon information and belief, Defendant Epley either informed Defendant Guy about this text, or Defendant Epley informed a third-party who informed Defendant Guy.

231.    Upon information and belief, Defendant Guy used this term to make it look more likely that Plaintiff had made the threatening statement that he falsely accused her of making.

232.    Defendant Guy's report was a blatant lie, as Plaintiff never said anything of the sort or threatened Defendant Guy or anyone else in any way.  Plaintiff has also never cut herself or anyone else, ever.

233.    On April 18, 2023, Plaintiff met with Nexsen and Justice to discuss Defendant Guy's false allegations concerning the February 20, 2023 meeting.

234.    Plaintiff explained that, at the meeting, Plaintiff told Defendant Guy that she was at an "impasse" with Largent and Lowery, that she had suffered ongoing harassment for two years, and she just wanted the harassment and unfair targeting to stop.

235.    Defendant Guy informed Plaintiff that "nobody is going to fix these people" and "nobody is going to fix [Epley]."

236.    Defendant Guy's response made Plaintiff feel defeated, demoralized, and hopeless – Plaintiff was suffering for their wrongdoing.

237.    Plaintiff was very frustrated, as Plaintiff had been trying to be a good, respectful supervisor and did not understand why Broughton's leadership was not supporting Plaintiff when others were targeting her for no legitimate reason.

238.    Nexsen and Justice responded that they would review Plaintiff's concerns and provide a written response.

239.    Plaintiff did not receive a response from Nexsen and Justice until after Plaintiff was terminated.

240. Plaintiff was notified that no disciplinary action would occur in response to her concerns.

241. Upon information and belief, Plaintiff's concerns were not properly investigated.

242. Defendant Guy specifically stated that Broughton Hospital could not take adverse action against Largent because she was black.

243. A trustworthy witness, who will remain unnamed in this Complaint due to fear of retaliation, heard Defendant Guy state that leadership gave such preferential treatment to black employees.

244. Defendant Guy informed Plaintiff in a private meeting that "blacks" have a sense of "entitlement", which he had seen a lot.

245. Defendant Guy compared Largent to a "Pitbull" and stated that Plaintiff should not be surprised that Largent "bites."

246. A trustworthy witness also informed Plaintiff that the witness had seen emails between leaders that discussed how to terminate Plaintiff. The witness stated that a friend in HR remarked that the friend knew about leadership's unjustified intentions to terminate Plaintiff and thought it was wrong.

247. On one occasion, Plaintiff was explaining to Defendant Guy the extent of the harassment and retaliation she was enduring.

248. Defendant Guy stated that he would "back up" Plaintiff's claims of mistreatment by Largent and Lowery.

249. Upon information and belief, Defendant Guy did not back up Plaintiff.

32

250.    In a private meeting with Plaintiff, Defendant Guy attempted to talk Plaintiff out of filing a complaint, stating that nobody would believe her and that the retaliation would only get worse.

251.    Defendant Guy stated that he and CEO Streater knew how bad the harassment of Plaintiff by Largent and Lowery was.

252.    Defendant Guy stated that CEO Streater had tried to move Largent and Lowery, but was apparently unable to do so because they refused to move.

253.    Upon information and belief, CEO Streater did not make such an effort (at least not in good faith).

254.    As CEO, Streater had the authority to move employees, which was demonstrated by her moving Plaintiff's department under Reba Yancey.

255.    Defendant Guy told Plaintiff that, in the "real world" (not the State government), Largent and Lowery would have been terminated for their mistreatment of Plaintiff.

256.    CEO Streater, instead of taking effective action to stop the harassment and retaliation of Plaintiff, allowed Plaintiff to be further targeted.

### **Wrongful Termination Based on False Complaint, and Biased and Fabricated "Fitness for Duty" Evaluation**

257.    On April 18, 2023, Defendant Guy met with CEO Streater, Defendant Epley, Justice, and Nexsen.

258.    Defendant Guy stated that Plaintiff was erratic, unstable, and potentially dangerous based on Plaintiff's alleged false comment about cutting Defendant Guy and other false allegations.

33

259.     Defendant Guy's statements and supposed "concerns" were objectively false and made in an effort to get Plaintiff terminated.

260.     Based on Defendant Guy's statements, CEO Streater directed an FFD evaluation to determine whether Plaintiff was fit to perform essential job functions, and to determine if Plaintiff posed a risk to herself or others in the workplace.

261.     Upon information and belief, neither Defendant Epley, Defendant Guy, Largent, nor Lowery was required to undergo an FFD evaluation.

262.     Plaintiff was placed on investigative leave with pay on April 26, 2023, pending the outcome of the FFD evaluation.

263.     Broughton Hospital referred Plaintiff to CPE for the FFD evaluation, which was conducted by Christopher A. Baker, Psy.D. in Winston-Salem, North Carolina on May 15, 2023.

264.     Dr. Baker's FFD evaluation report was issued the same day, on May 15, 2023.

265.     CPE's report was signed by both Dr. Baker and Dr. Warren, despite Dr. Warren not participating in the FFD evaluation.

266.     Dr. Warren never met Plaintiff.

267.     There were material biases, conflicts of interest, and other serious causes for concern with this FFD evaluation.

268.     According to his curriculum vitae, Dr. Warren had visiting staff privileges at Broughton Hospital since 2006.  Dr. Warren also founded CPE.

269.     Upon information and belief, CPE and Dr. Warren are closely connected with Broughton leadership, including CEO Streater, Defendant Epley, and Defendant Guy.

34

270. There was objectively insufficient evidence in CPE's report to determine that Plaintiff was unfit to perform essential job functions, or to determine that Plaintiff posed a risk to herself or others in the workplace. Accordingly, these were not the initial report's findings.

271. Rather, Dr. Baker generally concluded in CPE's report that Plaintiff "evidenced likely psychiatric and cognitive difficulties of unknown origins that seem likely to have contributed to the instant reason for referral …" and, based on that general conclusion, that Plaintiff was unfit for duty at that time.

272. There were two different copies of the report, one report given to Plaintiff and a different report provided to Broughton Hospital.

273. Defendant DHHS intentionally withheld its version of CPE's report, which included important information, from Plaintiff.

274. Plaintiff was accidentally made privy to the hospital's copy of the CPE report, which contained additional medical history of Plaintiff, other information about Plaintiff, and recommendations that Plaintiff was not supposed to see.

275. Defendant DHHS relied on the information that it intended to withhold from Plaintiff in its decision concerning whether to separate Plaintiff from employment.

276. Upon information and belief, Dr. Baker and Broughton Hospital violated Plaintiff's health privacy rights by disclosing Plaintiff's health information without Plaintiff's consent.

277. When Plaintiff asked Broughton for a copy of the full report from the hospital to review so Plaintiff could respond to its contents, the hospital refused and stated that the report was its paid-for copy.

35

278. Broughton Hospital did not initially know that Plaintiff had seen its copy. When Plaintiff informed them, they were upset about it. This occurred on a conference call that included Plaintiff, Defendant Guy, Justice, and possibly others.

279. Before Plaintiff informed Broughton that she had seen the hospital's copy of the report, when Plaintiff asked, Justice lied by responding that Dr. Baker had neither reviewed Plaintiff's private medical information nor made any recommendations.

280. Broughton Hospital changed Plaintiff's employment status to Extended Illness Leave, effective May 26, 2023, despite Plaintiff not having any illness.

281. During the meeting, Broughton offered Plaintiff to take FMLA leave.

282. Plaintiff refused to take FMLA leave because Broughton wanted her to admit to having serious mental illness, which was false, and Plaintiff believed Defendants would use such an admission to later terminate Plaintiff.

283. Plaintiff was shocked and confused by CPE's findings in its FFD evaluation report.

284. Plaintiff shared a copy of her FFD evaluation report with her long-time specialist, Amy Boison, PMHNP-BC, at NC Psychiatry for review.

285. On June 1, 2023, Boison performed an independent FFD evaluation of Plaintiff and found that Plaintiff was stable, fit for duty, and able to return to work immediately.

286. Boison further stated that Dr. Baker's characterization of Plaintiff was in stark contrast to Boison's experience with Plaintiff that was formed over consistent appointments that had been held with Plaintiff every 1-3 months since March 3, 2020.

36

287.    In addition to the above-stated concerns, Boison spoke with Dr. Baker on June 1, 2023.  On that phone call, Dr. Baker stated that he could not discuss Plaintiff with Boison beyond what was in the report.

288.    Dr. Baker stated to Boison that Broughton Hospital had provided CPE with employment-related information about Plaintiff <u>before</u> the FFD evaluation (which Dr. Baker stated could have included disciplinary reports, etc.).

289.    Upon information and belief, Broughton Hospital provided CPE and Dr. Baker with all of the ridiculous false statements that employees claimed Plaintiff had made.

290.    Thus, Dr. Baker lied in his report by stating that "clinical interview and mental status examination … and well researched test of behavioral health experiences and symptoms … are the **<u>sole</u>** sources of information relied upon in the current evaluation" (emphasis added).

291.    In a letter for Plaintiff to provide to Broughton Hospital, Boison stated: "It is nonsensical to me that this evaluation, describing mild PTSD and mild ADHD symptoms, would lead to an 'unfit for duty' determination.  Nowhere in this report is there any indication that Mr. Baker believed [Plaintiff] to be a danger to herself or others."

292.    Dr. Baker's FFD evaluation report did not find any evidence that could have led to Broughton Hospital concluding that Plaintiff was unfit for duty or a danger to anyone.

293.    Upon information and belief, once Plaintiff and Boison criticized Dr. Baker's report, Broughton had CPE issue a revised report with new findings that better supported Defendants' goal of terminating Plaintiff.

294.    Upon information and belief, Dr. Baker's clinical opinion was unduly and improperly influenced by Broughton Hospital's administrators (based on their relationship with

37

CPE through Dr. Warren), which resulted in a false and unreliable report that was used to unfairly and unjustifiably terminate Plaintiff.

295.    Upon information and belief, Broughton's leadership has used CPE to effectuate its desired employment outcomes before.

296.    Boison wrote a letter, dated June 7, 2023, stating her above-stated professional determinations and concerns with the FFD evaluation.

297.    Boison recommended that Broughton Hospital provide Plaintiff with reasonable accommodations for her disabilities.

298.    Broughton Hospital did not engage in any interactive process to provide Plaintiff with reasonable accommodations.

299.    Broughton Hospital, appearing to completely disregard information provided by Plaintiff and Boison, moved to separate Plaintiff from employment based on CPE's biased and flawed report.

300.    On June 9, 2023, Plaintiff attended a separation conference with Defendant Guy, Nexsen, and Justice.

301.    Plaintiff was not permitted to review the hospital's different copy of the FFD evaluation report, present witnesses (who could have refuted the flawed findings), or bring an attorney (who could have identified the hospital's wrongful conduct and failure to provide minimal due process) to the separation meeting.

302.    Despite Plaintiff pleading her case that she was available and fit for duty, which were true and substantiated by her neuro specialist, Plaintiff received a letter from Defendant Guy, dated June 27, 2023, stating that Plaintiff was separated from employment at Defendant DHHS.

38

303.    In Defendant Guy's June 27, 2023 letter, the hospital appeared to decline

Plaintiff's request for reasonable accommodations for her disabilities, citing undue hardship.

Upon information and belief, the hospital did not engage in a meaningful interactive process

because leadership was already set on terminating Plaintiff.

304.    Since there was insufficient evidence in CPE's FFD evaluation report to support

termination, Broughton Hospital must have relied, at least in part, on the symptoms of Plaintiff's

disabilities (ADHD and PTSD) to make its determination.

305.    There was, in any event, insufficient evidence to justify Plaintiff's termination,

and Broughton's leadership acted with improper and unlawful motives.

306.    After Plaintiff was terminated, Largent was given Plaintiff's then-vacant position.

307.    Largent was less qualified than Plaintiff for that position.

308.    Largent had specifically informed Plaintiff that Largent did not know how to do

the job, even though Largent had been doing it for eight years.

309.    Largent should have been terminated for her misconduct that was unbecoming of

a supervisory role.  At the very least, there was no legitimate reason to promote her.

**<u>Post-Termination Harassment and Retaliation</u>**

310.    Despite filing her complaint with OAH much earlier, OAH did not make its final

determination until June 30, 2023 (i.e., three days after Plaintiff was terminated).  The OAH's

determination was adverse to Plaintiff.

311.    Adopting the OAH determination, the EEOC did not conduct an independent

investigation into the State's actions and issued Plaintiff a NRTS letter on August 16, 2023.

312.    In late February 2024, Plaintiff received a letter from Lisa Bare, Personnel

Investigator at DHHS, informing Plaintiff that an allegation of misappropriation of patient funds

against Plaintiff was posted on the Health Care Personnel Registry ("HCPR"). The misappropriation was alleged to have occurred on December 21, 2022.

313.    The complaint to the HCPR was undisputedly false. Plaintiff was on leave from Broughton between December 16, 2022 and January 14, 2023.

314.    Once Bare confirmed those facts with Broughton Hospital, the complaint was rescinded and the investigation was closed without a finding against Plaintiff.

315.    There was also no evidence that Plaintiff had ever misappropriated funds, as Plaintiff had never done so.

316.    During the investigation, Plaintiff learned that the false allegations had been made anonymously by an employee of the Patient Advocacy Program ("Advocacy"), a separate entity located on Broughton Hospital's campus.

317.    There was patient billing information in the Advocacy employee's complaint that could only have come from Broughton Hospital, as Advocacy did not have access to it (e.g., calculating daily rates for residents based on insurance and pay rates).

318.    Plaintiff was informed by a trustworthy witness that Defendant Epley was having a sexual relationship with a female employee at Advocacy.

319.    Upon information and belief, Defendant Epley directed his paramour to make the false complaint against Plaintiff to the HCPR and provided confidential information for her to do so.

320.    For Defendant Epley, who Plaintiff believed to be narcissistic and very vindictive, such an act of retaliation could have been made eight months following Plaintiff's termination. That said, discovery is needed to learn when the complaint from Advocacy to the HCPR was

actually made – While Plaintiff received the notice letter in late February 2024, the complaint could have been made several months earlier.

321.    As a result of the HCPR complaint, Plaintiff was suspended from her new job on April 1, 2024, pending the outcome of the DHHS investigation.

322.    Plaintiff was informed that CEO Streater has instructed certain employees, who are known but unnamed in this Complaint to protect them from retaliation, to not speak with Plaintiff.

323.    Defendants knew their conduct toward, and treatment of, Plaintiff was wrong but nonetheless did it with intent to harm Plaintiff.

## Damages

324.    Plaintiff was unfairly and wrongfully terminated from her position at Defendant DHHS, which resulted in monetary damages (including lost wages and benefits, and costs of searching for a new job).

325.    Plaintiff lost time and money (including attorney's fees) defending against this false allegation.  It was also very emotionally distressing that, once Plaintiff had finally begun to move on from the hostile work environment at Broughton Hospital, her co-workers' harassment and retaliation followed her to her new job.

326.    Every time Plaintiff tried to move on from a set-back that was outside her control, she was unfairly and intentionally targeted without just cause.

327.    Plaintiff suffered substantial harm as a result of Defendants' actions against her, including significant emotional distress.

41

328.    Plaintiff was diagnosed with anxiety and depression, for which she has had to take medication, and was stressed to the point of chronic nausea. Her migraines became more frequent and intense.

329.    Defendants knew about Plaintiff's existing health conditions and subjected her to the above-described mistreatment anyway, which exacerbated Plaintiff's symptoms.

330.    Plaintiff's reputation was damaged.

### EEOC Charges and Plaintiff's Right-to-Sue; Administrative Exhaustion

331.    Upon information and belief, Plaintiff filed three (3) separate EEOC charges of discrimination, harassment, and retaliation against Defendant DHHS (d/b/a Broughton Hospital) for continuing violations of the ADA (disability discrimination) and Title VII (race / color discrimination, sexual harassment, and retaliation).

332.    The "fourth" EEOC "charge" that Defendants stated in their motion to dismiss was submitted on July 1, 2022 was actually only an inquiry submitted on July 1, 2023 that did not become a charge.

333.    Plaintiff also submitted inquiries on September 7, 2021, March 8, 2022, April 30, 2023, and July 1, 2023 in attempts to navigate the EEOC process and hold Defendants accountable.

334.    Plaintiff's first EEOC charge of discrimination was submitted on June 30, 2022 and amended on May 3, 2023 (with a NRTS letter issued on August 16, 2023).

335.    The second EEOC charge that Plaintiff submitted on August 5, 2024 (October 8, 2024 NRTS letter) involved new incidents of sex, disability, and race discrimination, harassment, and retaliation that were continuing violations of those asserted in the first EEOC charge. Most

42

importantly, Plaintiff added her wrongful termination claim that was not included in the first EEOC charge.

336.    The third EEOC charge was a summary of Plaintiff's prior two EEOC charges. This charge was submitted on December 18, 2024, with a NRTS letter issued on December 20, 2024.

337.    Therefore, the second and third EEOC charges amended the first EEOC charge because there were new violations that showed the same unlawful discrimination, harassment, and retaliation were unaddressed and escalating in severity. The claims were continuing and accruing.

338.    The wrongdoing that Plaintiff experienced at Broughton directly or indirectly stemmed from retaliation by Defendant Epley for Plaintiff rejecting his sexual advances and complaining about his sexual harassment and related retaliation.

339.    Accordingly, the timely filing of this Complaint based on the second and third NRTS letters, and the continuing nature of the ADA and Title VII claims, make this entire Complaint timely filed.

340.    If this Court determines otherwise, though it should not, Plaintiff was not represented by legal counsel for Broughton's internal grievance processes, OAH administrative proceedings, or the first two EEOC charges she filed, and the Court should allow her claims to proceed on the merits for the sake of equity and justice.

341.    Based on her prior experiences with OAH (which had already adjudicated the sex and disability discrimination claims) and her termination, any further internal grievances or OAH proceedings would have been futile (especially after her termination). The OAH does not award monetary damages, which Plaintiff believed was necessary to compensate her for the harm she

had experienced. The Defendants' actions were patently illegal. For these reasons and more, administrative exhaustion should not be required for Plaintiff to pursue her claims fairly in this Court.

342.     The OAH investigator also had a conflict of interest. The OAH investigator informed Plaintiff that the investigator was part of the State Employees Association of NC ("SEANC"). Knowing that SEANC was involved with Broughton on multiple occasions, Plaintiff researched the investigator online and learned that the investigator shared multiple mutual friends with Largent, CEO Vivian Streater, and other staff at Broughton Hospital.

343.     The OAH investigator and Defendant Epley's paramour at Advocacy, who upon information and belief submitted the HCPR complaint for misappropriation against Plaintiff Campbell, were in a picture together that was posted on Facebook.

344.     To the extent administrative exhaustion might be required, the OAH had an opportunity to adjudicate Plaintiff's claims of race discrimination, constitutional violations, breach of contract, wrongful discharge in violation of public policy, blacklisting, and post-OAH complaint acts of disability discrimination following Plaintiff's State complaint on July 11, 2023. However, the OAH declined to do so, citing lack of jurisdiction, in a letter to Plaintiff dated July 19, 2023.

345.     The EEOC and OAH both provided Plaintiff with a lot of incorrect information, which resulted in certain claims (like ongoing harassment) not being included when Plaintiff was told she was amending a charge. The EEOC investigator also did not tell Plaintiff until <u>after</u> the EEOC and OAH determinations that she could not hear Plaintiff's audio recordings, which were very important to the case. Had Plaintiff known, Plaintiff could have produced better copies.

44

346. Plaintiff requested that the EEOC perform a Substantial Weight review of the determination, but, despite all the fatal flaws of the investigation, to no avail.

347. At various times during the filing of claims with the EEOC and those claims being investigated, Plaintiff was caring for her husband (now deceased), who had been battling aggressive cancer. These are rare and exceptional circumstances beyond the Plaintiff's control that operate to toll the statute of limitations for each of her filed complaints with the EEOC.

## COUNT I

### Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964

### (Defendant DHHS Only)

348. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

349. Plaintiff was subject to unwelcome sexual harassment by Defendant Epley, which sexual harassment was directed at Plaintiff.

350. The harassment was based on Plaintiff's sex.

351. Defendant Epley's sexual harassment of Plaintiff was both severe and pervasive enough to alter the terms, conditions, and privileges of Plaintiff's employment.

352. Plaintiff's work environment was objectively and subjectively abusive, hostile and toxic as a result of Defendant Epley's sexual harassment.

353. There is a strong basis for liability against Defendant DHHS because Broughton Hospital's leadership knew about the sexual harassment, were in a position to address it, and failed to respond effectively to stop the sexual harassment, remedy its effects, and prevent its reoccurrence. In fact, the leadership enabled Defendant Epley (and employees at his direction) in ways that made the effects of sexual harassment worse for Plaintiff.

45

354. Defendant Epley was acting within the scope of his employment at Broughton.

355. As a direct and proximate cause of Defendants DHHS's actions, Plaintiff suffered (and continues to suffer) damages.

356. As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

357. Defendant DHHS has waived sovereign immunity as alleged herein.

<u>**COUNT II**</u>

**Disparate Treatment Race / Color Discrimination in Violation of
Title VII of the Civil Rights Act of 1964**

**(Defendant DHHS Only)**

358. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

359. Plaintiff is a member of a protected class (race). Specifically, Plaintiff is white and Largent is black.

360. Plaintiff suffered adverse actions based on her race, which ultimately culminated in Plaintiff's termination.

361. Plaintiff was treated differently than a similarly-situated employee based on her race. Specifically, Plaintiff was subject to disparate and worse treatment in disciplinary processes because Defendant DHHS sought to avoid perceived potential race discrimination claims by a black employee who was involved in those processes. Upon information and belief, this would not have occurred if the other involved employee had been white, which is demonstrated by the treatment of other white supervisors in a similar position with an employee of the same race.

46

362.    Following Plaintiff's termination, the involved black employee was given Plaintiff's position, despite being unable to perform the essential duties of the position and being a cause of issues in the department.

363.    As a direct and proximate cause of Defendant DHHS's actions, Plaintiff suffered (and continues to suffer) damages.

364.    As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

365.    Discrimination based on race / color was not added until the third EEOC charge because Plaintiff was misinformed by the EEOC investigator who initiated the charge and Plaintiff was not represented by legal counsel.  Plaintiff, who has no legal training, did the best she could and should not be prejudiced for any mistakes she made in a complex process.

366.    Defendant DHHS has waived sovereign immunity as alleged herein.

## COUNT III

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

### (Defendant DHHS Only)

367.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

368.    Plaintiff engaged in legally-protected action under Title VII.

369.    Defendants took adverse actions against Plaintiff, which adverse actions were likely to dissuade a reasonable employee from making or supporting the legally-protected action. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

47

370. Defendants took the adverse actions because of Plaintiff's legally-protected complaints, thereby engaging in intentional retaliation in violation of Title VII.

371. Defendants Epley and Guy were acting within the scopes of their employments at Broughton.

372. Defendant DHHS knew about Defendants Epley's and Guy's retaliation and, not only failed to stop it but, participated in the retaliation such that Defendant DHHS must be held legally liable.

373. There was no legitimate, non-retaliatory reason for the adverse actions against Plaintiff.

374. As a direct and proximate cause of Defendants' actions, Plaintiff suffered (and continues to suffer) damages.

375. As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on EEOC charges that amended prior EEOC charges.

376. Defendant DHHS has waived sovereign immunity as alleged herein.

## COUNT IV

**Failure to Engage in the Interactive Process and Failure to Accommodate
in Violation of Titles I and II of the Americans with Disabilities Act**

**(Defendant DHHS Only)**

377. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

378. Defendant DHHS is an "employer" subject to Title I of the ADA and a public entity subject to Title II of the ADA.

48

379.    Plaintiff was, at all times relevant, an "employee" of Defendant DHHS, as defined by the ADA.

380.    Plaintiff was, at all times relevant, a qualified employee with disabilities, a qualified employee regarded as disabled, or a qualified employee with a record of being disabled within the meaning of 42 USC § 12102.

381.    The ADA mandates that such public entities and employers make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability, as stated in 42 USC § 12131(2) and 28 CFR § 35.130(b)(7).

382.    Plaintiff required disability-related accommodations and services that were necessary to provide her with equal access to Defendant DHHS's services, programs, and activities.

383.    Defendant DHHS had an ongoing duty to engage in an interactive process with Plaintiff to identify and implement necessary accommodations.

384.    Defendant DHHS failed to engage in an interactive dialogue, assess the needs of Plaintiff, discuss potential accommodations, ensure that appropriate modifications were implemented, ignored requests to address accommodations, and refused to consider reasonable accommodations that would have addressed Plaintiff's disabilities.  Specifically, Boison raised Plaintiff's need for accommodations in her letter to the hospital's leadership.

385.    Defendant DHHS intentionally violated Plaintiff's rights under the ADA and its regulations by excluding her from participation in and denying them the benefit of Defendant DHHS's services, programs, and activities, on the basis of disability, and by subjecting them to discrimination in violation of 42 USC § 12132.

49

386.     Defendant Guy purposely assigned tasks to Plaintiff that would be difficult in light of Plaintiff's disabilities, without a reasonable accommodation, to harass her and set her up for termination.

387.     Inability to perform such tasks was given as a reason for her termination.

388.     Defendant DHHS intentionally treated Plaintiff differently on the basis of her disabilities.  Specifically, Defendant DHHS failed to engage in the interactive process and failed to accommodate Plaintiff because Defendant DHHS wanted to terminate Plaintiff and providing accommodations would have stood in the way of their goal.

389.     As a direct and proximate cause of Defendant DHHS's violation of the ADA, Plaintiff suffered (and continues to suffer) damages.

390.     As asserted above, Plaintiff is timely asserting her right to sue by making this Complaint within the statutory deadline based on a second EEOC charge that amended the first.

391.     Defendant DHHS has waived sovereign immunity as alleged herein.

## COUNT V

**Violations of the 14th Amendment to the United States Constitution**

**(Defendant DHHS Only)**

392.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

393.     The 14th Amendment of the United States Constitution states that no person can be denied the equal protection of the laws (Equal Protection Clause, US Const. amend. XIV, § 1).

394.     Further, no state can deprive a person of life, liberty, or property without due process of law (Due Process Clause, US Const. amend. XIV, § 2).

395.     Defendant DHHS was, at all times relevant, a state government subject to the Equal Protection Clause and the Due Process Clause of the 14th Amendment of the United States Constitution.

396.     Defendant DHHS violated the Equal Protection Clause by engaging in disparate treatment discrimination against Plaintiff (including terminating Plaintiff) based on sex, race, and disability.

397.     Defendant DHHS failed to provide Plaintiff with due process in its disciplinary process (e.g., failure to provide a fair, objective, unbiased, process free from conflicts of interest, etc.), which resulted in an arbitrary and capricious outcome that deprived Plaintiff of her property interest in her state government employment and benefits.

398.     If Defendant DHHS had provided proper due process, the result of the disciplinary process would have been different.  Specifically, Plaintiff would have kept her job and returned to work.

399.     Defendant DHHS did not have legitimate reason for its actions (including the wrongful actions of Defendants who were acting under color of state law).

400.     As a direct and proximate cause of Defendant DHHS's violations of the 14th Amendment of the United States Constitution, Plaintiff suffered (and continues to suffer) damages.

401.     Defendant DHHS has waived sovereign immunity as alleged herein.

## COUNT VI

### Wrongful Discharge in Violation of Public Policy (WDPP)

### (All Defendants)

402. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

403. Plaintiff was subjected to sexual harassment, disparate treatment race discrimination, disability discrimination, retaliation, and a general hostile and abusive work environment by Defendants.

404. Defendants knew of these serious issues and failed to take prompt and effective remedial action. Further, Defendant DHHS was complicit in them.

405. Defendants made or entertained false and petty allegations, as well as violated Plaintiff's constitutional due process rights in the disciplinary process, with intent to fabricate "justification" for terminating Plaintiff despite having no legitimate reason to do so.

406. Upon information and belief, Defendants were orchestrating and driving Broughton Hospital's wrongful adverse actions against Plaintiff such that each should be held jointly and severally liable.

407. Plaintiff was engaged in legally-protected activity when she refused to accede to Defendant Epley's unwelcome and inappropriate sexual advances, which are prohibited by NCGS § 143-422 (NC Equal Employment Practices Act); and when she complained of sexual harassment and related retaliation, race discrimination, and other activities which are prohibited by the NC Equal Employment Practices Act.

408. Plaintiff was wrongfully discharged from her employment at Defendant DHHS.

409.    Plaintiff was discharged because of her engagement in one or more of the above legally-protected activities, each of which was a substantial factor in her termination.

410.    Defendant DHHS violated Plaintiff's due process rights guaranteed by the State Constitution when terminating Plaintiff, which violated public policy.

411.    Defendants Epley and Guy were acting within the scopes of their employments with Broughton.

412.    As a direct and proximate cause of Defendants' actions, Plaintiff suffered (and continues to suffer) damages.

413.    Defendant DHHS has waived sovereign immunity as alleged herein.

414.    Defendants Epley's and Guy's actions were malicious, corrupt, or fraudulent, thereby depriving them of immunity.

## COUNT VII

### Blacklisting

### (Defendants DHHS and Epley)

415.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

416.    Plaintiff was an employee of Defendant DHHS, and Defendant DHHS discharged Plaintiff from its employ.

417.    Upon information and belief, Defendant Epley, without solicitation, by oral or written communication, unlawfully attempted to prevent Plaintiff from maintaining employment at another employer by making a false report of misappropriation of patient funds to the State's HCPR.

418.    Specifically, this claim is premised on intentional submission of a false complaint to harm Plaintiff, not on the performance of any public duties by the state or its employees.

419.    Upon information and belief, as a direct and proximate result of the actions by Defendant Epley (and / or his paramour at his direction), Plaintiff suffered (and continues to suffer) harm.

420.    Defendant Epley was acting outside the scope of his employment, and therefore is not protected by immunity.

421.    Or, alternatively, Defendant Epley acted within the scope of his employment, and Defendant DHHS is liable for Defendant Epley's actions.

422.    Defendant Epley's actions were malicious, corrupt, or fraudulent, thereby depriving him of immunity, because Defendant Epley knew or should have known that there was no factual basis for the complaint against Plaintiff made to the HCPR and, upon information and belief, Defendant Epley intended to harm Plaintiff at her new employment.

423.    Upon information and belief, Defendant DHHS has waived sovereign immunity.

## COUNT VIII

### Breach of Contract

### (Defendant DHHS Only)

424.    The above facts in this Complaint are incorporated by reference as if fully set forth herein.

425.    There was an employment contract between Defendant DHHS and Plaintiff.

426.    Plaintiff performed the employment contract.

427.    Defendant DHHS breached the employment contract.

54

428.     As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

429.     Defendant DHHS does not have immunity for its breach of a valid contract, as is the case here.

## COUNT IX

### Conspiracy

### (All Defendants)

430.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

431.     Defendants conspired through agreement with each other, as well as with Largent and Lowery, to commit an unlawful act, and/or to commit a lawful act in an unlawful way, to effect Plaintiff's wrongful termination without cause.

432.     Defendants committed an act in furtherance of the purpose of their agreement.

433.     The acts committed by Defendants as part of their conspiracy were the direct proximate cause of harm to Plaintiff.

434.     As a result, there is a basis to hold Defendants jointly and severally liable for their wrongful conduct.

## COUNT X

### Violations of the North Carolina State Constitution

### (Defendant DHHS Only)

435.     The above facts in this Complaint are incorporated by reference as if fully set forth herein.

55

436. To the extent Plaintiff does not otherwise have an adequate remedy (due to failure of exhaust, untimely filings, or any other reasons), Plaintiff asserts her State constitutional rights.

437. Article I, Section 19 of the North Carolina State Constitution prohibits the State from depriving a person of life, liberty, or property in an unlawful manner. This section further protects persons from unequal protection of the law based on protected status, including race and color.

438. Plaintiff had a property interest in her employment with the State.

439. Defendant DHHS violated Article I, Section 19 of the North Carolina State Constitution by unlawfully depriving Plaintiff of her above-described rights to due process and equal protection of the laws when Defendant DHHS terminated Plaintiff.

440. Article I, Section 14 of the North Carolina State Constitution provides the right to freedom of speech. Plaintiff was unlawfully terminated for exercising this right. Specifically, Plaintiff was complaining about matters of public concern related to unlawful discrimination, harassment, retaliation, and corruption within a State entity.

441. Defendants Epley and Guy were acting under color of state law on behalf of the State.

442. As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

443. Defendant DHHS is not immune from liability for violating the North Carolina State Constitution.

56

## COUNT XI

### 42 U.S.C. § 1983

**(Defendants Epley and Guy)**

444. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

445. Defendants Epley and Guy were government officials acting under color of state law on behalf of the State.

446. Defendants Epley and Guy violated Plaintiff's constitutional rights, as set forth above.

447. Defendants Epley and Guy acted maliciously, corruptly, or fraudulently.

448. As a direct and proximate result of the actions by Defendant DHHS, Plaintiff suffered (and continues to suffer) damages.

449. There is no sovereign immunity from Section 1983 actions.

## COUNT XII

### Punitive Damages

**(Defendants Epley and Guy)**

450. The above facts in this Complaint are incorporated by reference as if fully set forth herein.

451. Defendants Epley and Guy acted willfully, wantonly, intentionally, wrongfully, with hostility, manipulatively, oppressively, and without any justification. These Defendants have entirely and blatantly disregarded the law and all bounds of moral decency.

452. As a result of the nature of these Defendants' actions, Plaintiff is entitled to punitive damages to the extent permitted by each applicable law.

453.    Punitive damages are necessary to punish these Defendants and deter future wrongdoing, which Plaintiff strongly believes is highly likely.

**PRAYER FOR RELIEF**

**WHEREFORE**, based upon the foregoing, Plaintiff respectfully prays that:

1.    The Court find the Defendants liable to Plaintiff for their respective causes of action outlined above, or grant a jury trial on all issues so triable;

2.    Plaintiff have and recover of the Defendants, jointly and severally, compensatory damages (including loss of wages and benefits, damages for emotional distress, and harm to her reputation, etc.) to the extent permitted by law;

3.    Plaintiff have and recover of Defendants Epley and Guy, jointly and severally, punitive damages to punish their wrongful actions, and to deter future misconduct;

4.    Plaintiff have and recover of the Defendants, jointly and severally, all other damages available under the laws and legal causes of action applicable to this Complaint;

5.    Plaintiff have and recover of the Defendants, jointly and severally, post-judgment interest at the 8.00% per annum legal rate from the date of judgment;

6.    Plaintiff have and recover of the Defendants, jointly and severally, reasonable attorneys' fees to the extent permitted by law;

7.    The costs of this action be taxed against the Defendants;

8.    Administrative exhaustion not be required;

9.    Deadlines and statutes of limitations be tolled;

10. The Court grant leave to amend to add additional plaintiffs and claims to promote justice; and,

11. The Court grant such additional and further relief as this Court deems proper and just.

58

Respectfully submitted on May 28, 2025.

/s/ Ian M. McRary

_____

Ian M. McRary
NC Bar #43057
McRary Law, PLLC
231 Government Avenue S.W., #1094
Hickory, North Carolina 28603
Phone: (828) 235-5551
Email: ian@mcrarylaw.com

William E. Morgan
NC Bar #35459
Morgan Law, PLLC
200 First Avenue NW, Suite 531
Hickory, NC 28601
Phone: (828) 855-3212
Fax: (828) 855-3214
Email: morgan@morganlaw.org

**ATTORNEYS FOR THE PLAINTIFF**



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Charlotte District Office
129 West Trade Street, Suite 400
Charlotte, NC 28202
(980) 296-1250
Website: www.eeoc.gov

### DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/08/2024

**To:** Mrs. Linda W. Campbell
533 Pete Brittain Rd
MORGANTON, NC 28655
Charge No: 430-2024-03866

EEOC Representative and email: VICTORIA KNOTTS
Investigative Support Assistant
victoria.knotts@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 430-2024-03866.

On behalf of the Commission,

Digitally Signed By:Elizabeth "Betsy" Rader
10/08/2024
Elizabeth "Betsy" Rader
District Director

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Charlotte District Office
129 West Trade Street, Suite 400
Charlotte, NC 28202
(980) 296-1250
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/20/2024

**To:** Linda Campbell
533 Pete Brittain Rd.
Morganton, NC 28655
Charge No: 430-2025-01010

EEOC Representative and email:     ANGIE GALLO
Investigator
Angie.Gallo@eeoc.gov

## DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 430-2025-01010.

On behalf of the Commission,

**Angie Gallo**
Digitally signed by
Angie Gallo
Date: 2024.12.20
11:25:19 -05'00'        For

Elizabeth "Betsy" Rader
District Director

# EXHIBIT B



**NC DEPARTMENT OF**
# HEALTH AND HUMAN SERVICES

**ROY COOPER** • Governor

**KODY H. KINSLEY** • Secretary

**DARNELL THOMS** • Director, Equal Employment Opportunity

July 19, 2023

**Via Electronica E-mail:** linda.w.campbell@dhhs.nc.gov

Linda Campbell
533 Pete Brittain Rd
Morganton, NC 28655

**SUBJECT:**        Complaint Filed Date 7-11-2023
                    Determination of No Jurisdiction

Dear L. Campbell:

The EEO Office has reviewed your complaint alleging unlawful discrimination, harassment and retaliation, in regard to work assignment, demotion, promotion, dismissal, compensation reduction in force and over all performance rating on the basis of race, sex, disability and retaliation. Alleging that you were wrongfully terminated and written up amongst other communications and actions you believe constitute unlawful discrimination, harassment and retaliation. Your resolve you were seeking *is retribution and compensation.*

Per the State Human Resources Employee Grievance Policy, an applicant for State employment, career State employee alleging unlawful discrimination, harassment or retaliation shall file a complaint with the agency Equal Employment Opportunity (EEO) Officer or Affirmative Action (AA) Officer within 15 calendar days of the alleged discriminatory or retaliatory act that is the basis of the complaint. If the complainant alleges facts that would constitute unlawful discrimination, harassment, or retaliation as prohibited by law, the complaint will be investigated as a part of the EEO Informal Inquiry.

In order to constitute a violation of the discrimination statutes, a complaint of (discrimination or harassment) must be based on race, color, national origin, religion, sex, age, disability, genetic information, political affiliation, pregnancy, National Guard or veteran status, sexual orientation, gender identity or expression (Prohibited Grounds).

Because your complaint and the additional information (including adjudicated cases from Office of Administrative Hearings amongst others) you have provided do not allege facts that would constitute unlawful discrimination, harassment, or retaliation as prohibited by law, the complaint cannot be investigated as a part of the EEO Informal Inquiry.

If you are not satisfied with my decision, you may continue the process by filing a formal internal grievance, in accordance with the State of North Carolina Employee Grievance Policy (copy enclosed). If

**NC DEPARTMENT OF HEALTH AND HUMAN SERVICES • OFFICE OF THE SECRETARY**

LOCATION: 101 Blair Drive, Adams Building, Raleigh, NC 27603
MAILING ADDRESS: 2001 Mail Service Center, Raleigh, NC 27699-2001
www.ncdhhs.gov • TEL: 919-855-4800 • FAX: 919-715-4645

you elect to file an internal grievance, you must submit the DHHS Grievance Filing Form (copy enclosed) to your facility Human Resources Office within fifteen (15) calendar days of receiving this letter.

You may file a charge of discrimination, harassment, or retaliation directly with the Equal Employment Opportunity Commission (EEOC). You may file a charge with the EEOC either at an EEOC office or at the Office of Administrative Hearings Civil Rights Division. Information about filing an EEOC charge and the applicable deadlines can be found at: http://www.eeoc.gov/employees/charge.cfm or by calling the EEOC at 1-800-669-4000. Information about filing an EEOC charge through the Office of Administrative Hearing Civil Rights Division can be found at: http://www.ncoah.com/civil/ or by calling 919-431-3036.

Respectfully,

*DocuSigned by:*

*Darnell Thoms*

Darnell Thoms
Director EEO

Enclosures:    State Human Resources Employee Grievance Policy
               DHHS Grievance Filing Form
               Executive Order NO. 24

Grievance Policy
https://files.nc.gov/governor/documents/files/EO24-
Policies%20Prohibiting%20DiscriminationHarassment%26Retaliation%20in%20State%20Employ
mentServicesContracts.pdf



### STATE OF NORTH CAROLINA
### OFFICE OF ADMINISTRATIVE HEARINGS

Mailing address:
6714 Mail Service Center
Raleigh, NC 27699-6700

Street address:
1711 New Hope Church Rd
Raleigh, NC 27609-6285

June 30, 2023

FEPA Charge # 22 CRD 0038
EEOC Charge # 14B-2022-00038

**CHARGING PARTY:**
Linda Campbell
533 Pete Brittain Road
Morganton, North Carolina 28655

VS.

**RESPONDENT:**
Mr. Kody Kinsley
Secretary
N.C. Department of Health and Human Services
2001 Mail Service Center
Raleigh, North Carolina 27699-2001

### Notice of Determination – No Cause

Linda Campbell, hereinafter referred to as Charging Party, was employed with the NC Department of Health & Human Services. Charging Party claimed she was injured when she was hit by a car in the parking lot at work. While Charging Party was on Worker's Compensation, she and another co-worker, Mr. Epley (Male/No Known Disability) were sex texting with one another, including sending nude pictures. Prior to returning to work, her co-worker told her he was going to be promoted and it would be too late for them to have sex. When Charging Party returned to work, Epley told her she really didn't try to have sex with him and now it was too late. Epley became very angry and upset with her. Charging Party claimed that Epley harassed her by asking her if she was still crazy. Charging Party claimed that Epley started undermining and targeting her. He created a hostile and toxic work environment for her. He allied himself with both of her co-

| Administration | Rules Division | Judges and Assistants | Clerk's Office | Rules Review Commission | Civil Rights Division |
|---|---|---|---|---|---|
| 984-236-1850 | 984-236-1850 | 984-236-1850 | 984-236-1850 | 984-236-1850 | 984-236-1919 |
| fax:984-236-1871 | fax: 984-236-1947 | fax: 984-236-1871 | fax:984-236-1871 | fax: 984-236-1947 | fax: 984-236-1946 |

An Equal Employment Opportunity Employer

Case 1:25-cv-00068-MR-WCM   Document 18-2   Filed 05/30/25   Page 64 of 83

workers (Female) that she supervised. He further harassed her by giving her additional work.

On March 16, 2022, Charging Party filed a sexual harassment complaint with Respondent against Epley. On May 2, 2022, Respondent informed her that they were removing Epley out of the area and she was told that Reba Yancey (Female/No Known Disability) would become her new supervisor. On May 31, 2022, Charging Party reported to Yancey that Epley went by her desk at least twenty (20) times trying to look in her office. On June 14, 2022, Charging Party complained that Epley was still harassing her. Respondent told Charging Party that Epley would be removed from the area by July 1, 2022. Charging Party stated that Respondent is aware that Epley is still harassing her, and nothing is being done.

Charging Party alleged she has been discriminated against due to her sex (Female), disability (TBI), and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disability Act of 1990, as amended, and Chapter 7A-759(b1) of the North Carolina General Statutes.

The North Carolina Department of Health & Human Services, hereinafter referred to as Respondent, denied the allegations and contended that Charging Party was not discriminated against due to her sex (Female), disability (TBI), or in retaliation. Beginning July 1, 2021, Carl Epley (Male/No Known Disability) became Charging Party's supervisor. On March 29, 2022, Reba Yancey (Female/No Known Disability) became Charging Party's temporary supervisor. On April 29, 2022, Yancey became Charging Party's permanent supervisor.

On September 16, 2021, Epley issued Charging Party a Written Warning for personal conduct. Respondent maintained that Charging Party did not submit a rebuttal to the Written Warning.

On March 14, 2021, Charging Party met with Candice Justice (Female/No Known Disability), Human Resources Manager, and Alicia Nexsen (Female/No Known Disability), Employee Relations Specialist. At the meeting Charging Party submitted a written complaint of concerns regarding her interactions with Epley and her co-workers. She felt they were all discriminating against her. An investigation was conducted by an independent investigative team. The investigation team was unable to substantiate Charging Party's claims but identified areas for improvement regarding interpersonal interactions and communication between staff members. Respondent inactivated Charging Party's Written Warning.

In this regard the record of evidence showed the following:

2

**Findings of Fact**

1.  Respondent is Broughton Hospital with the North Carolina Department of Health and Human Services, employing approximately 1,224 employees.

2.  Charging Party's position at the time of the charge was Administrative Officer I, subject to the provisions of Chapter 126 of the North Carolina General Statutes, the North Carolina Human Resources Act.

3.  Charging Party filed her employment discrimination charge with the Equal Employment Opportunity Commission (EEOC) and with the Office of Administrative Hearings/Civil Rights Division/Employment (CRD) on July 1, 2022. The one hundredth eighty (180th) day in this case is January 2, 2022. The three hundredth (300th) in this case is September 4, 2021. Any allegation made prior to September 4, 2021, is time-barred, and was not investigated in this charge.

4.  Charging Party began employment with Respondent on July 1, 2008. She left Respondent's employment on August 9, 2009. Charging Party was re-hired by Respondent on August 1, 2010.

5.  Charging Party's position at the time of her charge was Administrative Officer I. She is responsible for patient-related financial matters within the hospital, including information collection to evaluate a patient's ability to pay for their hospital stay, such as commercial insurance, Medicare, and Medicaid. She oversees two (2) patient relations representatives and provides supervision to coordinate and oversee reimbursement activities within the Hospital and takes measures to maximize receipts working within the guidelines established by the Central Billing Office and Respondent's Cash Management.

6.  Charging Party's disability is Traumatic Brain Injury (TBI). She has the following injuries – brain injury, migraines, anxiety, impulsivity, PTSD, mood instability, bi-polar, hypersexuality, and there are problems with her brain connections. She has problems spelling. She sometimes writes backwards.

7.  On October 8, 2018, Charging Party was hit by a car in Respondent's parking lot. Charging Party was out of work from October 9, 2018, to October 14, 2018. She returned to full duty on October 15, 2018. Charging Party's injuries were covered under Worker's Compensation (WC), and she was placed on WC leave on October 18, 2018. Charging Party returned to light duty work on November 13, 2018, and to full duty work on December 17, 2018. She went back out on WC leave on November 12, 2020. She

3

returned to light duty work on May 24, 2021, and full duty work on June 4, 2021.

8. While Charging Party was out due to her disability, she, and Carl Epley (Male/No Known Disability), began "sex texting" with one another. They sent pictures to one another. Epley was a co-worker of Charging Party. They were planning on having sex with one another. They never had sex. Charging Party confirmed during her interview that the sex texting was consensual. During Charging Party's interview for this investigation, Charging Party stated that the sexual harassment stopped before she returned to work in May 2021.

9. When Charging Party returned to work, her supervisor was Bea Tullis (Female/No Known Disability). She supervised two (2) employees – Catherine Largent (Female/No Known Disability) and Jennifer Lowery (Female/No Known Disability).

10. On June 16, 2021, Charging Party lost her work keys. She went around the office asking other co-workers to help look for her keys. Charging Party went to Largent and told her to look in her purse for the keys. Largent told Charging Party that she had already looked in her purse for the keys. Charging Party told Largent to look again. This was witnessed by several employees.

11. Some days later, Charging Party found her keys in a notebook that was at Lowrey's desk. Charging Party told Lowery that "you better be glad you weren't here that day because I would have blamed you and probably would have fired you and told you to go home." In her statement, Lowery maintained that Charging Party was not laughing or smiling when she made the comment. She was not joking.

12. Charging Party had a meeting with Epley and Tullis on June 28, 2021. Epley and Tullis told Charging Party that her employees felt that Charging Party was accusing them of stealing her keys and calling them a thief. Epley tried to explain to Charging Party there are ways to say things that are not perceived as being negative, and they asked Charging Party to try and be careful with her words. Charging Party asked them to cut her some slack since she just returned to work.

13. Charging Party sent Epley a text on June 28, 2021. The text stated "As you know I'm a pretty smart cookie. And I know who complained. I hope you don't think she likes you???? She was telling me previously that you were having sex with Mary Anderson in the dental department, and she would always watch your office to see if she came by and she caught y'all meeting at the bathroom several times and texting back and forth and she couldn't

4

stand you. Just so u know you are being played because she thinks she can get on your good side. Just thought you should know. So, one minute you want to fu.. me, the next cut me??? You know I am straight forward and tell it like it is." Epley responded "People like to think what they want to think."

14. Charging Party complained to the investigators, who were investigating her internal sexual harassment complaint, that she sent the text to Epley. When asked, Charging Party stated "at the end Sheila (the investigator) says well are you sure he's discriminating against you because he won't have sex with them? I said yes most definitely! He was mad when I told him no! And look at how he's retaliating."

15. Beginning July 1, 2021, Epley became Charging Party's direct supervisor. His position was Business Manager and Chief Financial Officer (CFO).

16. On July 30, 2021, Charging Party sent Epley another email -- "I'm leaving at 12:00 just tired of all the discrimination. I can't talk right now to upset." Charging Party claimed that Epley called her after she sent the email, but she did not answer.

17. On August 12, 2021, Catherine Largent filed a hostile work environment and retaliation complaint against her supervisor, Charging Party. Largent wrote "This is due to my supervisor's unprofessional actions and difficulty communicating. It has also created a hostile work environment because I feel uncomfortable around her, and I feel my work performance is being negatively affected." Largent listed numerous occasions that she felt she was being harassed including increasing her workload, trying to get a co-worker to talk about her, unreasonable deadlines, accusing Largent of "jumping on her", and calling Largent to come into her office while other staff were present. Largent specifically noted on June 16, 2021, Charging Party asked to look in Largent's purse to look for Charging Party's missing keys. Charging Party made an accusation like "I'm a thief" and based on stereotypes that others have with people who look like me." Largent is Black. Charging Party is White. Largent asked a co-worker to witness her looking for Charging Party's keys in her purse while Charging Party was watching. Largent proceeded to look in her purse and desk drawers, which was very embarrassing and insulting to her.

18. Lowery confirmed in her statement that Charging Party told her since Largent is making more money, she could do all the work assignments.

19. On August 13, 2021, based on Largent's complaint, Epley initiated a management investigation. The investigation was conducted by Epley and Olga Propst (Female/No Known Disability), Psychiatric Unit Administrator.

Epley and Propst interviewed staff and other witnesses, including Largent and Lowery.

20. Epley and Propst interviewed Charging Party on August 16, 2021, and Charging Party provided a statement afterwards. During the interview, Charging Party claimed that she felt that she was being targeted and discriminated against. During the interview, Charging Party claimed that she did not accuse anyone of stealing her keys.

21. On August 31, 2021, Propst sent a letter to Largent regarding her complaint she filed on August 3, 2021. Propst wrote that "While the information did not substantiate your allegation of unlawful workplace harassment, we did find supervisory issues that need to be addressed. Management will take appropriate steps to address the concerns and improve working relationships and promote harmony in the workplace."

22. On September 16, 2021, Epley issued Charging Party a Written Warning following a management investigation that determined Charging Party violated policy, caused disharmony, disrupted the workplace, and interacted with others in an inappropriate, discourteous, and unprofessional manner.

23. On September 27, 2021, a mediation was conducted between Largent and Epley. They agreed there were no violations of race harassment. The investigation acknowledged in violation of other facility policy, and appropriate actions were taken to prevent any reoccurrence of any policy violations. Largent has an open-door policy with Epley to report any further violations of policy, any violations of the retaliation policy. Any job performance issues would be addressed by the supervisor in a private, professional, and one-on-one manner.

24. In November 2021, Charging Party alleged that she went to HR to complain about Epley, but she did not report the sex part.

25. During the week of March 7, 2022, Charging Party claimed that Epley told her that Jassen Phillips (Male/No Known Disability) had told him that Charging Party told Phillips to not come back to her office anymore. Charging Party had told Phillips not to come to her office because people were saying that they may be having sex. Charging Party was upset that Phillips had told Epley.

26. On March 10, 2022, Charging Party emailed Justice, copied Epley, and requested a meeting to discuss issues in her department. On March 11, 2022, Justice emailed Charging Party for available dates. On March 13, 2022, Charging Party emailed Justice and Nexsen and requested to meet with them privately the following day.

6

27. On March 14, 2022, Charging Party met with Justice and Nexson. During the meeting, Charging Party submitted a written complaint with her concerns with interactions with Epley and her two (2) co-workers – Catherine Largent (Female/No Known Disability), Administrative Assistant and Jennifer Lowery (Female/No Known Disability, Administrative Assistant. Charging Party claimed that she felt she was being discriminated against by Epley, Largent, and Lowery.

28. In the complaint, Charging Party wrote that when she returned to work, Epley told her that "she really did not want to have sex with him and now it was going to be too late because he was going to be her supervisor." Charging Party maintained that "Note Carl never said a word to me after he became my supervisor regarding the sex thing."

29. On March 16, 2022, Nexson and Justice referred Charging Party's concerns to Vivian Streater (Female/No Known Disability), Hospital Director/Chief Executive Officer (CEO), who requested an investigation.  On March 17, 2022, Streater met with Charging Party and offered to temporarily reassign Charging Party while the investigation was being conducted.  Charging Party asked to think about it.  On March 22, 2022, Charging Party emailed Streater and requested that Epley be moved.

30. Streater appointed an independent investigative team consisting of Shelia Taylor (Female/No Known Disability), Chief of Quality, Risk Management & Compliance, and Beth Travis (Female/No Known Disability), Human Resources Manager with J. Iverson Riddle Developmental Center (another Respondent facility).

31. Charging Party did not feel that Travis should have been allowed to investigate her claims because she lied to Charging Party when she said that she did not know anyone from Broughton Hospital. Charging Party had looked her up on Facebook and she was married to an employee who worked at Broughton Hospital.

32. On March 22, 2022, Streater notified Epley about the investigation.  The investigation began on March 29, 2022.

33. While her complaint was being investigated, Charging Party agreed to a temporary reassignment in her work location and supervisor.  On March 29, 2022, Charging Party was temporarily reassigned and began reporting to Reba Yancey (Female/No Known Disability).  Charging Party's physical office location changed from the second floor Business Office to the third Executive Suite.  Charging Party's work schedule and other terms and conditions of employment did not change.

34. On April 7, 2022, Darnell Thomas (Male/No Known Disability), DHHS EEO Director, emailed Nexson and Justice and attached a letter dated April 6, 2022, with the determination on the EEO Informal Complaint Charging Party filed with the DHHS EEO Office on March 29, 2022. Thomas wrote that Charging Party's complaint does not allege facts that would constitute unlawful discrimination, harassment, or retaliation as prohibited by law.

35. On April 13, 2022, Taylor and Travis provided Streater with their investigation summary and informed Streater that they did not substantiate Charging Party's allegations but identified areas for improvement regarding interpersonal interactions and communication between staff members.

36. Charging Party met with Nexson and Justice about the duration of the investigation. She was directed to contact Taylor with any questions about the investigation.

37. On April 13, 2022, Taylor and Travis submitted their Workplace Investigation Summary to Streater. The report indicated Yancey stated there was a meeting between herself, Charging Party and Epley to discuss issues in the department. Charging Party spoke to Epley in a way she would not speak to anyone, much less her supervisor. Taylor and Travis found that Charging Party and Epley both admit to communications of a personal/sexual nature prior to Epley's selection for the Chief Financial Officer position. Both parties agreed the communication was consensual and it stopped prior to Epley's promotion to Charging Party's supervisor. Charging Party denies being physically intimidated or fearful of Epley. The investigation did not substantiate the allegation of a hostile work environment and turning staff against her.

38. On April 29, 2022, Streater and Taylor met with Charging Party and informed Charging Party of the outcome of the investigation and management's commitment to take appropriate steps to address the identified concerns, improve working relationships, and promote a professional and harmonious workplace environment. Charging Party was permanently reassigned to Yancey, effective April 29, 2022.

39. Streater also met separately with Epley on April 29, 2022, and addressed the investigative findings. During the meeting, Streater outlined her concerns regarding Epley's failure to disclose his prior relationship with Charging Party. Streater told Epley that Charging Party was being permanently assigned to Yancey.

40. On May 2, 2022, Justice, Nexson, and Shannon Hennessee (Male/No Known Disability), Chief Nursing Officer, participated in a Just Culture Panel and discussed the investigative findings regarding Epley. The panel agreed

with Streater's recommendation to coach Epley. Streater also decided to inactivate the Written Warning issued to Charging Party on September 16, 2021.

41. Some of Charging Party's harassment claims were: that Epley was undermining her as a supervisor; Epley was whispering in the file room with Largent; Epley was messing with her blinds; her subordinates (Largent and Lowery) were undermining her; Epley was walking by her office frequently; Largent was attacking her; Largent and Lowery were targeting her; she was being set up by Tullis, Epley, Largent, and Lowery; Epley told Largent that she did not have to sign the paper form of her VIP; and her co-workers' gossiped about her. Charging Party added that Epley harassed her when he gave her extra work. Charging Party stated that she has been doing the extra work since 2016.

42. Charging Party complained on May 31, 2022, that Epley went by her office more than twenty (20) times. A statement was provided by Katherine Franklin (Female/Disability) indicated that Epley went by Charging Party's office over twenty (20) times.

43. Charging Party complained on June 2, 2022, that Epley was harassing her by walking by her office. Streater determined that Epley was conducting normal business activities and utilizing the copier, which was near Charging Party's office. Respondent provided copies of the numerous copies Epley made on May 31, 2022.

44. On June 7, 2022, Streater met with Epley. She verbally counseled Epley and directed him to review Respondent's Ethics Forum Training and Code of Conduct. Streater had informed Epley that Charging Party had alleged continued harassment and instructed him to avoid Charging Party's office. On July 1, 2022, Epley was given the keys to his office, and he finished moving and was permanently in his new office on July 8, 2022.

45. Charging Party sent numerous texts that she received from her co-workers – Lowery and Largent beginning in April 2021. Largent wrote – "Praying for you this morning." "Just wanted to check on you and see if you need anything." Lowery sent a text message on September 8, 2021. The text message read "I love you sweet lady!!" Charging Party wrote on the text message page – "Jennifer Lowery saying she loved me this was when they were working on getting me fired. I had gotten written up that next week September 16th due to Catherine Largent and Jennifer Lowery."

46. Charging Party and Respondent sent ten (10) statements from employees in Charging Party's area. For most of the ten (10) employees, several statements from each employee were presented. Nine (9) of the witnesses

9

were Female, and one (1) of the witnesses was male. Nine (9) of the witnesses had no known disability and one of the witnesses had a disability.

47. Some of the witnesses maintained that they had overheard conversations that Charging Party was loud and ill-tempered; Charging Party was snippy towards Largent; she had a tone; the person was humiliated by Charging Party; and Charging Party was yelling and swinging her arms in the file room.

48. In a signed statement (no date), Yancey stated that she felt that Epley was harassing Charging Party and she felt that Largent and Lowery were playing a role in the harassment. Yancey was told that Epley walked by Charging Party's desk at least twenty (20) times on May 31, 2022. When asked by Charging Party to say something nice about her, he said he liked her coffee cup. Epley's office had not been moved yet. Epley asked Charging Party to keep her blinds open because her co-workers could not see when she was in her office. Largent complained that Charging Party was not answering her phone.

49. During her interview on August 16, 2021, Lowery maintained that Charging Party told her she thought Tullis or Largent had taken her keys. Lowery stated that she felt uneasy around Charging Party. Charging Party told her "She would bring in a gun and kill everyone."

50. Epley signed a statement on July 30, 2022. In his statement, he confirmed that he and Charging Party sent sex texts to one another. He was not her supervisor at the time. He was not angry at her. He claimed he did not make fun of Charging Party's disability. He did not remember calling her crazy. He stated he did not ally himself with Largent and Lowery to harass Charging Party. He stated that he did walk by Charging Party's office twenty-one (21) times on May 31, 2022. He printed fifty-four (54) documents that day for the end of the year. Epley submitted that Document Usage Details by Device on May 31, 2022.

51. In a statement, Kimberly Moody (Female/No Known Disability) claimed that she saw the email where Epley called Charging Party crazy.

52. In her statement, Tullis claimed that Charging Party had to be moved out of Patient Financial because there were issues between her and another employee which caused them to have to be physically separated.

53. Donna White (Female/No Known Disability) sent a text to Charging Party regarding work. She started the text by saying "Hey crazy!! I mean Linda." Charging Party told her that was offensive. White stated that she did not mean her comment that way. She claimed that she apologized to Charging

10

Party and told her that it would never happen again. White reported her comments to Yancey.

54. On April 26, 2023, Charging Party called claiming that Respondent placed her out of work for a Fitness for Duty test.

55. In an email dated June 2, 2023, Charging Party claimed that the following week Respondent called her and stated that she was deemed unfit for duty and that she would need to talk with her doctor about her options which included FMLA and or short-term disability.

### Prima Facie Case and Analysis

A.     Threshold Jurisdictional Requirements

The NCOAH Civil Rights Division has jurisdiction over the parties and subject matter as follows: Charging Party (Linda Campbell) (Female/TBI), was employed by NC Department of Health and Human Resources, where she was in an Administrative Officer I position; a position that was subject to the non-exempt provisions of North Carolina General Statutes (NCGS) Chapter 126. Accordingly, all three threshold requirements, covered employee, timeliness, and subject matter jurisdiction have been satisfied. The Investigation finds that Charging Party has met the threshold jurisdictional requirements, permitting inquiry to proceed further.

B.     Prima Facie Case

1.   Disability

Under the ADA, a plaintiff must show that she suffers from a disability as that term is defined in the Act. The ADA defines an individual with a disability as one who has:

(1) A physical or mental impairment that substantially limits a major life activity,
(2) A record of such impairment; and
(3) Is regarded as having such impairment.

During filing of the charge, Charging Party maintained that her disability was TBI. As a result of her TBI she suffered from brain injury, migraines, impulsivity, PTSD, mood instability, bi-polar, hypersexuality, and anxiety. Based on an interpretation of the ADA and viewing the evidence in the most favorable light to Charging Party, Charging Party's TBI met the definition of disability.

2.   Sexual Harassment/Harassment Due to Sex and Harassment Due to Disability

11

In this case, there is no direct evidence of discrimination. Both Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. § 12101 et seq., prohibit an employer from subjecting an employee to a hostile work environment. 42 U.S.C.S. § 2000e-2(a)(1); 42 U.S.C.S. § 12112(a). To establish a prima facie case of sexual harassment/harassment/hostile work environment or disability discrimination under Title VII and the ADA, Charging Party must show that:

(1) She is a member of the protected class.
(2) The conduct in question is unwelcome.
(3) The conduct is based on sex/disability harassment.
(4) The harassment is sufficiently severe or pervasive to alter her terms and conditions of employment and to create an abusive working environment.
(5) It was imputable to her employer.

With respect to Charging Party's sexual harassment allegations, Charging Party claimed that she was sexually harassed by her co-worker, Carl Epley (Male/No Known Disability), who then became her supervisor. After examining the evidence, Charging Party was unable to establish element (2). Charging Party claimed while she was out of work on WC, she and Epley sex texted each other. Charging Party maintained the sex testing was consensual. Charging Party wrote in her complaint to Respondent that Epley never said a word to her after he became her supervisor about the sex thing.

The record of evidence demonstrated that Charging Party sent an email to Epley on June 28, 2021. The nature of the email was inappropriate for an employee to send to another employee, in particular a supervisor. Finally, Charging Party indicated during an interview for this investigation that the "sex texting" was consensual, and it ended by the time she returned to work. The Charging Party failed to establish her prima facie elements. She failed to show that the "sex texting" was unwelcome.

Regarding Charging Party's harassment based on sex claims against her co-workers, both co-workers are the same sex (Female) as Charging Party. Charging Party claimed that she was harassed by her co-workers and Epley. She gave several examples of harassment by Epley, Largent, Lowery, and other Respondent management. The Investigation found that Charging Party's alleged harassment allegations was not based on sex, and neither was it severe or pervasive.

Under Title VII, the "severe or pervasive" requirement has both an objective and subjective component. Harris v. Forklift Sys., 510 U.S. at 21-22, 114 S. Ct. 367. "The objective component is judged from the perspective of a reasonable person in the plaintiff's position." Oscale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In Faragher, the Court made clear

that the "conduct must be extreme" to be actionable. Faragher v. City of Boca Raton, 524 U.S. at 788, 118 S.Ct. 2275.

The Courts also hold that a finding cannot be made for the Charging Party when "there is no indication that any of the incidents: complained of were the result of animosity toward Charging Party's protected class." Causey v. Balog, Et al No. 962350, (4th Cir. December 1998). The evidence did not reveal that anything was said or inferred to Charging Party that related to her sex.

Concerning Charging Party's claims that she was harassed due to her disability, Charging Party claimed that Respondent was discriminating against her due to her brain injury (TBI). The examples that Charging Party gave were Epley asked if she was still crazy, a co-worker referred to her as crazy, her subordinate employee asked if she was okay because she was not acting like herself, and co-workers called her crazy behind her back. In reviewing the record of evidence, Charging Party's co-worker, Kimberly Moody, saw the text where Epley asked if she was still crazy. The employee who referred to Charging Party as crazy, maintained that she did not reference crazy as mentally ill, but just as a greeting she would send any friend. A different employee that asked if Charging Party was okay, was concerned about Charging Party's health. All these comments together do not meet the standard of proof for making a prima facie case of disability discrimination charge.

Workplace incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard for a hostile work environment claim under Title VII. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). This also applies to hostile environment claims under Title I of the ADA.

3.    Retaliation

Finally, Charging Party would have to establish a prima facie case of retaliation under Title VII and the ADA, Charging Party must show that:

(1) Charging Party engaged in a protected activity under the statute,
(2) Respondent acted to harm Charging Party,
(3) There was a causal connection between Charging Party's activity and Respondent's action.

Charging Party's first engagement in a protected activity was when Charging Party sent Epley an email indicating that she was leaving for the day because of all the harassment. Epley called her and she did not answer the phone. When Charging Party met with Epley and Propst during an investigation regarding Largent's complaint, Charging Party did not claim that she had been sexually harassed. She claimed that she had been harassed by Largent and Lowery. Charging Party

13

claimed that she went to HR in November 2021, to complain about Epley. She again did not claim sexual harassment by Epley.

Charging Party alleged sexual harassment during her meeting on March 14, 2022, with Justice and Nexson. During the meeting, Charging Party submitted a written complaint with her specific allegations. Charging Party then notified management and HR about her sexual harassment complaint. Charging Party showed that she had participated in a protected activity.

Next, Charging Party demonstrated that she suffered harm when she received the Written Warning on September 16, 2021. She received the warning after an investigation conducted by Epley and Propst. Charging Party did not receive harm after she allegedly filed a sexual harassment complaint against Epley on March 14, 2022.

As a result of Charging Party's claim, Streater immediately set up an independent investigative team to investigate Charging Party's allegations. Charging Party was temporarily, then permanently, reassigned to another supervisor. She was temporarily moved to another location during the investigation. Even though the investigative team was unable to substantiate Charging Party's sexual harassment claims, she was permanently reassigned to another supervisor, Epley's office was moved, Epley was counseled, and Charging Party's Written Warning was deemed inactive. Respondent clearly went above the requirements of the law.

With respect to Charging Party's Written Warning received on September 16, 2021, Charging Party complained about discrimination/harassment on July 30, 2021. In the email where she complained, there were no details or examples given about the discrimination.

Charging Party complained about harassment a second time during an interview with Epley and Propst regarding the harassment claim filed against her. There were more details given about her perceived harassment. Some of her examples, she complained that her staff and management were working together to harass and target her. People had mean looks on their faces.

The interview with Charging Party was conducted on August 16, 2021, and she turned in her statement on August 17, 2021. Charging Party received the Written Warning on September 16, 2021. There was a close time period between Charging Party's harm and her complaint. Charging Party established her prima facie case.

Next, if the Charging Party succeeds in proving the prima facie case, the burden shifts to the Respondent "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

The Respondent maintained that as soon as management was aware of Charging Party's claims, they took swift and appropriate action. They acted in accordance with policies and procedures. As stated previously, Charging Party was given a different supervisor, Epley's office was moved, and Charging Party's Written Warning was inactivated, and Epley was counseled. Respondent took these actions even though the internal investigation was unable to substantiate Charging Party's claims. As a result of Respondent's actions, Charging Party did not suffer harm; her Written Warning was inactivated.

Based on the evidence and a further review of the Written Warning, the record indicated that there was sufficient evidence to show that the information in the Written Warning was correct. The written documentation and the witness statements supported the information in the Written Warning.

The Fourth Circuit has held that "[a]n employer may enforce generally applicable employment policies against their employees without creating a cause of action for retaliation." *Wells v. Gates, 336 F. App'x 378. 385 (4th Cir. 2009).*

The Written Warning was removed because the investigation against Charging Party was partially conducted by the alleged harasser, and the alleged harasser failed to disclose his prior relationship with the Charging Party. The investigation found that Charging Party has failed to adduce any credible evidence that Respondent's explanation was pretextual, much less that it's true motivation was discrimination.

**Conclusions of Law:**

Charging Party alleged that she was sexually harassed by a co-worker while she was out on WC. After she returned to work, Charging Party claimed that she was harassed based on her sex (Female), her disability (TBI), or in retaliation due to participation in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disability Act of 1990, as amended, and Chapter 7A-759(b1) of the North Carolina General Statutes.

The Respondent denied Charging Party's claims. Respondent maintained that after Charging Party complained an investigation was conducted. The investigation was unable to substantiate Charging Party's complaint. Respondent inactivated Charging Party's Written Warning, reassigned Charging Party to another supervisor, and moved Epley to another office. Respondent took reasonable action after Charging Party's complaint.

Regarding Charging Party's sexual harassment claims, Charging Party was unable to show that her sexual harassment claims were unwelcome. Concerning her harassment claims based on sex and disability, Charging Party was unable to show that the harassment was based on sex and her disability, and she failed to

show that harassment met the severe or pervasive standard. Charging Party was unable to establish her prima facie elements with regards to harassment.

Concerning her retaliation allegation, Charging Party established her prima facie elements. Respondent presented non-discriminatory reasons for their actions. Charging Party was unable to show that their reasons were pretextual.

The Investigation concludes, based on the foregoing evidence, that Charging Party was unable to meet the burden of proof; and that there has been no violation of the North Carolina General Statutes 7A-759(b1); Title VII of the Civil Rights Act of 1964, as amended, or the Americans with Disabilities Act of 1990, as amended.

## Determination

Therefore, I am advising, by receipt of this letter, that this **No Cause Determination** concludes our processing of Charging Party's employment discrimination charge. The investigative files will be reviewed by the U.S. Equal Employment Opportunity Commission (EEOC) District Office in Charlotte, North Carolina.

Under Section 1601.76 of the Equal Employment Opportunity Commission's (EEOC) Regulations, you are entitled to request that the EEOC perform a Substantial Weight Review of this Agency's No Cause Determination. To request a review, you must send an email to EEOC within 15 days of receiving this No Cause Determination. (Otherwise, EEOC will generally adopt this Agency's No Cause Determination). Your request should be sent to:

> Eyerusalem Haile
> State, Local, and Tribal Coordinator
> Equal Employment Opportunity Commission
> Charlotte District Office
> eyerusalem.haile@eeoc.gov

**The Respondent and the Charging Party are again reminded that Federal law prohibits retaliation or discrimination against persons filing charges, assisting, or participating in an investigation, or providing information pursuant to any proceeding, inquiry, or hearing under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act or Title I of the Americans with Disabilities Act.**

16

Notice of Determination
Linda Campbell v. NCDHHS
#14B-2022-00038 / #22-CRD-0038

On Behalf of the
Office of Administrative Hearings

*June D. Melvin*

Compliance Manager
Civil Rights Division

## CERTIFICATE OF SERVICE

I certify that, on this day, the foregoing **SECOND AMENDED COMPLAINT** was filed electronically with the Clerk of Court using the CM/ECF system, on which the below counsel are registered.  A courtesy copy was also served upon the below counsel via email at the below address:

**W. Clark Goodman**
**Laura G. Brook**
Hall, Booth, and Smith, PLLC
11215 North Community House Rd., Suite 750
Charlotte, NC 28277
cgoodman@hallboothsmith.com
lbrook@hallboothsmith.com

**ATTORNEYS FOR CPE**

**Daniel K. Covas**
**Erika Johnson**
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
dcovas@ncdoj.gov
ejohnson@ncdoj.gov

**ATTORNEYS FOR DEFENDANTS DHHS, EPLEY, AND GUY**

William E. Morgan
Morgan Law, PLLC
200 First Avenue NW, Suite 531
Hickory, NC 28601
morgan@morganlaw.org

**ATTORNEY FOR THE PLAINTIFF**

Respectfully submitted on May 28, 2025.

/s/ Ian M. McRary

_____

Ian M. McRary
McRary Law, P.L.L.C.
231 Government Avenue S.W., #1094
Hickory, North Carolina 28603
ian@mcrarylaw.com

**ATTORNEY FOR THE PLAINTIFF**